IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 7, 2003 Session

## JOAN B. HARDCASTLE, ET AL. v. FRANK HARRIS

**Appeal from the Chancery Court for Davidson County**
**No. 00-2172-III      Ellen Hobbs Lyle, Chancellor**

---

**No. M2002-01087-COA-R3-CV - Filed December 8, 2004**

---

This appeal concerns a pyramid sales scheme involving the sale of unregistered investment contracts. After discovering that their contracts were worthless, four purchasers filed separate actions against the person who sold them the contracts. These cases were consolidated for trial in the Chancery Court for Davidson County. Following a bench trial, the trial court determined that the seller had breached his personal guarantee contract with two of the buyers and had violated the Tennessee Securities Act of 1980 by selling unregistered investment contracts to all the purchasers. Accordingly, the court awarded the four purchasers judgments totaling $99,450.00, as well as $44,979.50 for attorney's fees and legal expenses. The seller asserts on this appeal that the Tennessee Securities Act claims were filed after the statute of limitations had expired and that the doctrines of waiver and estoppel prevent the purchasers from asserting these claims. In addition, he insists that the court erred by permitting the purchasers to amend their complaints one week before trial to add their Tennessee Securities Act claims. He also takes issue with the trial court's decision to award the purchasers their attorney's fees. We affirm the judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which WILLIAM B. CAIN, and PATRICIA J. COTTRELL, JJ., joined.

Mathew R. Zenner, Nashville, Tennessee, for the appellant, Frank Harris.

David B. Lyons, Nashville, Tennessee, for the appellees, Joan B. Hardcastle, Glen Hardcastle, Joseph Pope, and Charles Provance.

### OPINION

### I.

Frank Harris operates several businesses in Madison, Tennessee. He owns a small real estate business called Impact and a small company called Impact International, Inc. that manufactures industrial lubricants. He has aspirations of becoming a major developer and entrepreneur. The centerpiece of his plans is a "perpetual world's fair type development" called Uniquest. As Mr. Harris envisions it, the development will consist of twelve theme parks spread over 50,000 acres in Warren County. He estimates that the development will cost approximately "fifty billion dollars."

Mr. Harris decided that he needed ten million dollars in "seed money" to get Uniquest off the ground. In the late 1990s, after his efforts to obtain bank financing for the project proved unsuccessful, Mr. Harris began searching for business opportunities that would enable him to raise a great deal of capital in a short period of time. Sometime during 1997 or 1998, Mr. Harris became acquainted with Ron Hogsed, who lived in Erwin, Tennessee, and began discussing a number of get-rich-quick schemes with him.

The wheels of Mr. Hogsed's and Mr. Harris's first venture began to turn in late 1998 or early 1999 after Mr. Hogsed became an agent for Hercules Holding LIT. Hercules Holding purported to be a "program" located in London, England that purportedly purchased large blocks of United States treasury bills at deep discounts and then resold blocks of treasury bills at enormous profit. Mr. Hogsed incorporated Merit Quest Management International, Ltd. ("Merit Quest") in the West Indies to operate this business. Mr. Hogsed told Mr. Harris about his Merit Quest venture in early 1999, and Mr. Harris became interested in the program because some bankers had purportedly told him that the only way to raise the ten million dollars needed for Uniquest would be to buy and sell treasury bills.

In February or March 1999, Mr. Hogsed sent Mr. Harris a set of materials describing the Merit Quest "asset enhancement program." These materials stated: (1) that participation in the program was by invitation only; (2) that the program was private and confidential; (3) that the program had been operating successfully for over three years; and (4) that the program was "licensed under SEC Rules and Regulations." The materials also stated that the minimum investment in the program was $10,000 and that participants investing between $10,000 and $24,999 would earn twenty-five percent (25%) per month.[1]

According to Mr. Hogsed's materials, investors in Merit Quest would transfer their funds to Merit Quest's "trust account" at an overseas bank. The funds would then be pooled with the funds of other investors and would eventually be transferred to a "program attorney's" "client trust account" where they would be used to purchase treasury bills "for the benefit of the [p]articipant." Following the purchase of the treasury bills, investors would receive their first interest payment within four to six weeks. The materials stated that each participant's investment was protected because it is "free and clear of encumbrances during and after [the] contract" and because it was insured by "Zenith Insurance Ltd."

Mr. Harris decided to become an agent of Merit Quest and eventually signed a "Non-Circumvention & Non-Disclosure Agreement" and a "Program Agreement" with Mr. Hogsed. In return for Mr. Harris's agreement to "introduce" "clients" to Merit Quest and to act as "Trust Officer" with regard to the disbursement of all "earnings, commissions, and investment returns," Mr. Hogsed agreed to pay Mr. Harris a ten percent (10%) commission on all funds wired to Merit Quest's accounts in either Erwin, Tennessee or London, England, as well as 50% of the monthly earnings after these funds were invested. Mr. Harris was responsible for paying the clients he introduced to the program using the funds he received from Merit Quest.

---

[1]Participants investing $100,000 or more would earn fifty percent (50%) per month.

Mr. Harris then prepared another set of materials to distribute to potential investors.[2] These documents characterized Merit Quest as a "best efforts high yield program" in which persons who invested $10,000 for one year could receive "potential returns" with a "very high degree of confidence of [s]uccess" of twenty-five percent (25%) every thirty days.[3] In addition, they referred to Mr. Harris variously as a "transaction manager" or a "trust officer." The documents also contained various assurances regarding the safety of the investments. The program description stated that each participant's investment would be held "in a major foreign [b]ank, which insures 100% of all deposits." Mr. Harris's early documents stated that "Impact/Frank Harris underwrites and protects all principal investments for investors through corporate and personal investment guarantees."[4] Several months later, Mr. Harris's guarantee was replaced by a "Trust Agreement" in which Mr. Hogsed accepted "full legal, personal and corporate responsibility for the safety and accurate disbursement of funds . . . with which I am entrusted."

Mr. Harris then set about to recruit persons who would act as "introducers" for him, who in return would be given a commission for every person they brought into the program through him. Eventually, Mr. Harris recruited six or seven introducers, including his brother-in-law, Gordon Hawkins, and his sister, Susan Murphey. These introducers set about telling their family and acquaintances about Merit Quest. In May 1999, Mr. Harris convinced his father, Darryl A. Harris, to invest $37,500 in Merit Quest. This proved to be a potent marketing tool because his father was a prominent Baptist minister who was well-known in the community. Many potential investors assumed that Merit Quest must be a good program if Darryl Harris had invested in it.

Between March and October 1999, Mr. Harris and his introducers convinced 118 persons to invest $3,300,000 in Merit Quest.[5] Included among these investors were Glen and Joan Hardcastle who were neighbors of Mr. Harris and his father. The Hardcastles invested $30,000 in September 1999 and made a second investment of $25,000 one month later. In turn, they told Billy Hardcastle,

---

[2]These materials included: (1) a description of the Merit Quest program; (2) a chart showing the projected earnings of investments from $10,000 to $25,000; (3) an "Understanding and Agreement" to be signed by the investor and Mr. Harris; (4) a "Letter of Intent" to be signed by the investor; (5) a "Joint Interest Agreement" to be signed by the investor and Mr. Harris; (6) a power of attorney to be signed by the investor; (7) a withdrawal request form to be signed by the investor; and (8) instructions for wiring investments directly to an account at Lloyd's Bank in London purportedly controlled by Merit Quest for the use of Hercules Holding.

[3]The "projected" earnings of a $10,000 investment were $145,508 if the participant left all of his or her earnings in the program for one year.

[4]These guarantees took the form of a "promissory note" on Impact stationery stating that "[i]t is agreed that only the principal investment will be returned to the investor by Frank A. Harris and/or Impact in the event that Merit Quest Management fails to return the investment as agreed." Mr. Harris stopped giving his customers this corporate and personal guarantee at some point in September or October 1999 because he ran out of the personal funds needed to make good on the guarantee.

[5]Mr. Harris himself claims to have invested $210,000 in the program. Mr. Hawkins and his wife invested $15,000 in the program. The record contains no evidence that Ms. Murphey invested in Merit Quest.

Mr. Hardcastle's brother,[6] and Dale Pyron, Mr. Hardcastle's cousin, about the program.[7] In October 1999, Joe B. Pope and his wife invested $10,000 despite Mr. Pope's belief that Merit Quest was a pyramid scheme. Likewise, Mr. Charles Provance, one of Mr. Harris's long-time friends, invested $25,000 in October 1999.

A profile of the Merit Quest investors emerges from their testimony at trial. Most of them had a common church affiliation with Messrs. Harris and Hawkins.[8] None of them understood how the Merit Quest program worked, and few of them read or understood the program materials or documents they signed. None of them sought independent financial or legal advice, and many of them were influenced by the fact that Darryl Harris had invested in the program.[9] Most of the investors did not believe that they would earn the promised rate of return, but they believed Mr. Harris's assurances that their principal was safe and that it would be returned to them at the end of the contract period.

The Securities and Exchange Commission learned of Merit Quest after one of Mr. Harris's introducers posted the program on the Internet. It forwarded the information to the Division of Securities of the Tennessee Department of Commerce and Insurance. On October 25, 1999, after receiving additional information from the Attorney General and Reporter, the Division of Securities issued a cease and desist order directing Merit Quest, Mr. Harris, and others to refrain from violating the Tennessee Securities Act of 1980 by acting as unregistered broker-dealers and by selling unregistered securities.

The issuance of the cease and desist order forced Mr. Harris and his introducers to stop accepting new investors. At the same time, Mr. Hogsed stopped sending monthly earnings and commissions payments to Mr. Harris for distribution,[10] causing a dispute between Mr. Harris and Mr. Hogsed. During December 1999 and January 2000, Mr. Harris wrote a series of heated letters to Mr. Hogsed demanding $17,847,172, representing "all payments due from you to Frank Harris, Impact, Brokers, and all Investors that we represent in the Merit Quest Program," and accusing Mr. Hogsed of stealing and other dishonesty. In a January 6, 1999 letter, Mr. Harris told Mr. Hogsed that "[t]his business has proven more than you can handle" and that "I will not allow you to pull me down with your attempts to steal from investors and brokers."

---

[6] Billy Hardcastle did not have sufficient funds to make his own $10,000 minimum investment. Accordingly, he gave his brother $5,000 to invest for him. Thus, Glen Hardcastle's total investment was $60,000.

[7] Mr. Pyron invested $25,000 in Merit Quest. Ms. Murphey promised to pay Ms. Hardcastle a $1,000 commission for introducing Mr. Pyron to the program but paid her only $500.

[8] Mr. Hawkins himself is a former Baptist minister.

[9] Mr. Hardcastle, for example, testified that he understood that "Brother Harris has invested in it, and made a small fortune off of it" and that "[e]ven though, I felt like this was too good to be true, everybody else was getting in on it, I said why not me."

[10] Mr. Hogsed claimed that an agent of Hercules Holding had drained all the funds from the Merit Quest trust account at Lloyd's Bank.

Beginning in January 2000, Mr. Harris began sending letters to his investors in the Merit Quest program to update them on the status of their investments. The purpose of these letters was, in Mr. Harris's words, "to hold them [the investors] at bay, so to speak, in regard to going to the SEC or somebody like that."[11] In February 2000, he informed his investors of his plan to file a class action suit against Mr. Hogsed. In April 2000, Mr. Harris informed his investors that the lawsuit against Mr. Hogsed had been filed but that Mr. Hogsed was evading service of process. He also stated that he was "working from three different angles" to recover their investments and interest.[12] Finally, in August 2000, Mr. Harris informed the investors that he was continuing "to expend significant effort and money to locate Mr. Hogsed" but that "finding Mr. Hogsed is not as important now since the money may be completely out of his control." He also reminded investors that "their principle and interest are being sought in a 'Master lawsuit' against 'Merit Quest' (Ron Hogsed)" and stated that he "expect[ed] to disburse proportionally to investor's contract dates and their amount of investment."

Mr. Harris's letter did not hold his investors at bay for very long. On July 12, 2000, the Hardcastles filed suit against Mr. Harris in the Chancery Court for Davidson County seeking compensatory and punitive damages.[13] Eight days later, on July 20, 2000, the Pyrons filed an identical suit in the Chancery Court for Davidson County using the same lawyer who was representing the Hardcastles. These suits prompted Mr. Harris to send a facsimile to the Hardcastles and Pyrons expressing his disappointment and displeasure over their lawsuits. After the Pyrons agreed to dismiss their lawsuit in return for Mr. Harris's agreement to reimburse their $25,000 investment, Mr. Harris asked a group of fellow churchmen to resolve the dispute with the Hardcastles. The Hardcastles did not accept this offer.

In December 2000, Mr. Provance filed suit against Mr. Harris in the Chancery Court for Davidson County.[14] Five months later, in May 2001, Mr. Pope sued Mr. Harris in the Metropolitan General Sessions Court alleging violations of the Tennessee Securities Act of 1980, as well as other claims related to his $10,000 investment. In July 2001, Mr. Pope's suit was removed to the chancery court and consolidated with the pending complaints of the Hardcastles and Mr. Provance.

---

[11]In his January 18, 2000 letter to investors, Mr. Harris cautions that "[i]t may prove to be very costly to everyone if someone else gets hyper. We feel we are moving in the right direction and expect an ending to this ordeal very soon."

[12]Mr. Harris stated that he and his wife had "retained three law firms and expended many thousands of dollars" and that they were (1) working to supply the State with all the information needed for the administrative hearing; (2) pursuing collection efforts from Hercules Holdings' attorney in Houston, Texas; and (3) continuing the litigation with Mr. Hogsed.

[13]The Hardcastles' complaint contained causes of action for (1) breach of contract, (2) negligence and negligent misrepresentation, (3) fraud and fraudulent breach of trust, and (4) violation of the Tennessee Consumer Protection Act by selling an unregistered security without a license.

[14]Although Mr. Provance had retained other lawyers to represent him, the causes of action in his complaint tracked those in the Hardcastles' complaint.

Meanwhile, on the regulatory front, an administrative law judge conducted a hearing in November 2000 regarding the Division of Securities' request for a cease and desist order. In February 2001, the administrative law judge issued an initial order upholding the October 25, 1999 cease and desist order after concluding that the Merit Quest program was an unregistered investment contract and that Mr. Harris was not registered as a broker-dealer as required by the Tennessee Securities Act of 1980.

On October 12, 2001, ten days before the scheduled beginning of the trial, the Hardcastles and Messrs. Provance and Pope moved to amend their complaints to include a cause of action based on the Tennessee Securities Act of 1980. The trial court granted the motion.[15] On January 9, 2002, following a five-day trial, the trial court filed its memorandum and order concluding that Mr. Harris had breached his guarantee contract with regard to the Hardcastles' initial investment, and that he had violated the Tennessee Securities Act of 1980 in his dealings with the Hardcastles and Messrs. Provance and Pope by selling them an unregistered security. Pursuant to the remedies available under the Tennessee Securities Act of 1980, the trial court awarded the Hardcastles a $59,950.00 judgment, Mr. Provance a $27,500.00 judgment, and Mr. Pope an $11,000.00 judgment along with an additional $44,979.50 for attorney's fees and expenses.[16] Mr. Harris perfected this appeal after the trial court denied his Tenn. R. Civ. P. 59.04 motion. The Hardcastles and Messrs. Provance and Pope have also appealed from the dismissal of their fraudulent misrepresentation claims.

## II.
### THE STANDARD OF REVIEW

We turn first to the proper standards of review for the issues presented in this appeal. Because this is an appeal from a decision made by the trial court itself following a bench trial, the now familiar standard in Tenn. R. App. P. 13(d) governs our review. This rule contains different standards for reviewing a trial court's decisions regarding factual questions and legal questions.

With regard to a trial court's findings of fact, we will review the record de novo and will presume that the findings of fact are correct "unless the preponderance of the evidence is otherwise." We will also give great weight to a trial court's factual findings that rest on determinations of credibility. *In re Estate of Walton*, 950 S.W.2d 956, 959 (Tenn. 1997); *B & G Constr., Inc. v. Polk*, 37 S.W.3d 462, 465 (Tenn. Ct. App. 2000). However, if the trial judge has not made a specific finding of fact on a particular matter, we review the record to determine where the preponderance

---

[15]While the motion to amend was filed jointly by the Hardcastles and Messrs. Provance and Pope, only two amended complaints were ever filed. No amended complaint on behalf of Mr. Pope was ever filed. The style of Mr. Provance's amended complaint named the Hardcastles as the plaintiffs and Mr. Provance as the defendant. Mr. Harris has not taken issue with these discrepancies.

[16]The trial court dismissed the contract claims of Messrs. Provance and Pope because they had been unable to prove that Mr. Harris had guaranteed their investments. It also dismissed all the claims under the Tennessee Consumer Protection Act because the act does not apply to the sale of securities, as well as all negligence and fraud claims because the plaintiffs had been unable to prove that they acted reasonably in relying on Mr. Harris's representations regarding their expected earnings and the safety of their investment. Finally, the trial court denied the claims for punitive damages because the plaintiffs failed to prove that Mr. Harris knew that the program was a fraud or that he profited personally from being involved with the program.

of the evidence lies without employing a presumption of correctness. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997).

Tenn. R. App. P. 13(d)'s presumption of correctness requires appellate courts to defer to a trial court's findings of fact. *Fell v. Rambo*, 36 S.W.3d 837, 846 (Tenn. Ct. App. 2000); *Taylor v. Trans Aero Corp.*, 924 S.W.2d 109, 112 (Tenn. Ct. App.1995). Because of the presumption, an appellate court is bound to leave a trial court's finding of fact undisturbed unless it determines that the aggregate weight of the evidence demonstrates that a finding of fact other than the one found by the trial court is more probably true. *Estate of Haynes v. Braden*, 835 S.W.2d 19, 20 (Tenn. Ct. App. 1992) (holding that an appellate court is bound to respect a trial court's findings if it cannot determine that the evidence preponderates otherwise). Thus, for the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect.

The presumption of correctness in Tenn. R. App. P. 13(d) applies only to findings of fact, not to conclusions of law. Accordingly, appellate courts review a trial court's resolution of legal issues without a presumption of correctness and reach their own independent conclusions regarding these issues. *Johnson v. Johnson*, 37 S.W.3d 892, 894 (Tenn. 2001); *Nutt v. Champion Int'l Corp.*, 980 S.W.2d 365, 367 (Tenn. 1998); *Hicks v. Cox*, 978 S.W.2d 544, 547 (Tenn. Ct. App. 1998); *McCormick v. Aabakus, Inc.*, 101 S.W.3d 60, 62 (Tenn. Sp. Workers Comp. Panel 2000).

## III.
### THE AMENDMENTS ADDING CLAIMS BASED ON VIOLATIONS OF THE TENNESSEE SECURITIES ACT

Mr. Harris first takes issue with two aspects of the trial court's decision to permit the Hardcastles and Mr. Provance to amend their complaints to add claims asserting that he had violated the Tennessee Securities Act of 1980. He insists that they should not have been permitted to amend their complaints at such a late stage of the litigation because they had acted in bad faith and had waived their right to assert the claim. Mr. Harris also insists that the trial court erred by failing to continue the trial after it permitted the amendments. We have determined that the trial court did not err either by granting the Hardcastles' and Mr. Provance's motions to amend their complaints to seek recovery for violations of the Tennessee Securities Act of 1980 or by declining to continue the trial after granting the motions to amend.

### A.

The October 25, 1999 cease and desist order put Merit Quest's investors and their lawyers on notice that the Division of Securities had concluded that Mr. Harris had violated the Tennessee Securities Act of 1980 by selling an unregistered security. Yet, when the Hardcastles and Mr. Provance filed their complaints against Mr. Harris in July 2000 and December 2000 respectively, they did not include a Tennessee Securities Act claim among the many claims they asserted.[17] The

---

[17] Their complaints included claims based on breach of contract, negligence, negligent misrepresentation, fraud, and violation of the Tennessee Consumer Protection Act. The consumer protection claim is a curious admixture of

(continued...)

lawyer who prepared the Hardcastles' complaint apparently decided to include a consumer protection claim rather than a securities claim because treble damages were available under the Tennessee Consumer Protection Act[18] and because Mr. Harris had consistently denied that Merit Quest was a security.

This strategy changed following the administrative law judge's February 2, 2001 order concluding that Merit Quest was a security and that Mr. Harris had violated the Tennessee Securities Act of 1980 by selling an unregistered security without a license. On May 22, 2001, the lawyer who was already representing the Hardcastles, and presumably Mr. Provance, filed a civil warrant on behalf of Mr. Pope in the Metropolitan General Sessions Court that included a claim for violating the Tennessee Securities Act of 1980, as well as claims for fraud and violation of the Tennessee Consumer Protection Act.[19]

On August 15, 2001, Mr. Harris moved for summary judgment with regard to all the claims of the Hardcastles and Messrs. Provance and Pope.[20] During the hearing on this motion on October 12, 2001, Mr. Harris insisted that the consumer protection act claims should be dismissed because the Merit Quest contracts were securities and because the Tennessee Consumer Protection Act did not apply to transactions involving securities that fall within the purview of the Tennessee Securities Act.[21] The trial court agreed with Mr. Harris and dismissed the consumer protection claims. Immediately following the hearing on Mr. Harris's summary judgment motion, the Hardcastles and Messrs. Provance and Pope moved to amend their complaints to add a claim based on the Tennessee Securities Act of 1980. The trial court granted the motion on October 18, 2001 and reaffirmed its decision on October 22, 2001 – the day before the trial began.

## B.

Tennessee law and policy have always favored permitting litigants to amend their pleadings to enable disputes to be resolved on their merits rather than on legal technicalities. *Karash v. Pigott*, 530 S.W.2d 775, 777 (Tenn. 1975); *Patton v. Dixon*, 105 Tenn. 97, 103, 58 S.W. 299, 301 (1900);

---

[17](...continued)
consumer protection and securities law. It specifically alleges that "[t]he sale of the investment instrument by Defendant Harris constituted a sale of an unlicensed security by an unlicensed broker."

[18]The lawyer later explained that "we asked for relief under the Tennessee Consumer Protection Act, because of the Treble Damages provision and the attorney's fee."

[19]By agreement, Mr. Pope's case was removed to the Chancery Court for Davidson County and consolidated with the pending cases filed by the Hardcastles and Mr. Provance.

[20]The style of the summary judgment motion names only the Hardcastles as the plaintiffs. However, the order granting the summary judgment identifies the Hardcastles and Messrs. Provance and Pope as the plaintiffs. Accordingly, we will assume that the parties and the trial court considered the summary judgment to be directed toward the claims of all the plaintiffs.

[21]*See Nichols v. Merrill, Lynch, Pierce, Fenner & Smith*, 706 F. Supp. 1309, 1322-23 (M.D. Tenn. 1989) (holding that the Tennessee Consumer Protection Act does not apply to transactions involving securities governed by the Tennessee Securities Act of 1980).

*Rutherford v. Raines*, 3A Tenn. (2 Cooke) 35, 42 (1814). This policy is reflected in Tenn. R. Civ. P. 15.01's admonition that "leave [to amend a pleading] shall be freely given when justice so requires." While decisions whether to permit an amendment are discretionary, *Daniels v. Tallent*, 212 Tenn. 447, 462, 370 S.W.2d 515, 522 (1963), Tenn. R. Civ. P. 15.01 substantially lessens a trial court's discretion to deny a requested amendment. *Branch v. Warren*, 527 S.W.2d 89, 91-92 (Tenn. 1975).

Despite the liberality implicit in Tenn. R. Civ. P. 15.01, the courts have identified a number of circumstances that, singly or in combination, could warrant denying a motion to amend a pleading. These circumstances include: (1) undue delay in seeking the amendment, (2) lack of notice to the opposing party, (3) bad faith or dilatory motive of the moving party, (4) repeated failure by the moving party to cure deficiencies in earlier amendments, (5) futility of the proposed amendment, and (6) undue prejudice to the opposing party. *Forman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962); *Gardiner v. Word*, 731 S.W.2d 889, 891-92 (Tenn. 1987). Of these factors, the most important is the proposed amendment's potential prejudicial effect on the opposing party. 6 CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1487, at 613 (2d ed. 1990) ("FEDERAL PRACTICE AND PROCEDURE").

Analyzing the prejudicial effect of a proposed amendment requires a careful examination of the facts of the case. The courts must consider the position of both parties and the effect that granting or denying the request will have on each of them. This entails inquiring into (1) the hardship on the moving party if the amendment is denied; (2) the reasons for the moving party's failure to include the claim, defense, or other matter in its earlier pleading; and (3) the injustice to the opposing party should the motion to amend be granted. 6 FEDERAL PRACTICE AND PROCEDURE § 1487, at 621-23.

Late amendments fundamentally changing the theory of a case are generally not viewed favorably when the facts and theory have been known to the party seeking the amendment since the beginning of the litigation. *March v. Levine*, 115 S.W.3d 892, 909 (Tenn. Ct. App. 2003). *See also Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 140 (5th Cir. 1993) (holding that the plaintiffs would not be allowed to amend their complaint a second time because they knew of the facts underlying the claim before the action was filed); *Windsor Card Shops, Inc. v. Hallmark Cards, Inc.*, 957 F. Supp. 562, 571 (D.N.J. 1997) (denying the plaintiff's motion to amend because the plaintiff could have included the claim in its original complaint but did not do so for strategic reasons). Accordingly, the courts usually deny this sort of amendment when the opposing party can legitimately claim surprise or when it will (1) cause additional expense and the burden of a more complicated and lengthy trial, (2) require the opposing party to engage in significant additional pre-trial preparation, (3) unduly increase discovery, or (4) unduly delay the trial. *Morongo Bd. of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990); *Troxel Mfg. Co. v. Schwinn Bicycle Co.*, 489 F.2d 968, 971 (6th Cir. 1973); 6 FEDERAL PRACTICE AND PROCEDURE § 1487, at 623-32.

## C.

Omitting an unregistered securities claim from the Hardcastles' and Mr. Provance's original complaints was unnecessarily risky. When the investors filed their original complaints, the parties

and their lawyers knew all the facts underlying the claim and that the Division of Securities had commenced an administrative enforcement proceeding against Mr. Harris for selling unregistered securities. In addition, they knew or should have known that Tenn. R. Civ. P. 8.01 expressly permits pleading in the alternative.[22] Thus, by including both their consumer protection claim and their unregistered securities claims in their original complaint, the Hardcastles and Mr. Provance could easily have avoided the predicament of seeking permission to add a new claim to their complaint on the eve of trial. Mr. Harris's concession that the Merit Quest contracts were securities saved the Hardcastles' and Mr. Provance's unregistered securities claims from the potentially prejudicial effects of their lawyer's pleading strategy.

Mr. Harris's eventual concession that the Merit Quest contracts were securities was intended to undermine his investors' consumer protection claims and the accompanying exposure to treble damages. However, by closing the door on the consumer protection claims, Mr. Harris, perhaps unwittingly, opened the door to claims under the Tennessee Securities Act of 1980. The Hardcastles and Mr. Provance were not seeking to delay the trial or to take unfair advantage of Mr. Harris when they sought permission to amend their complaint. Rather, they were simply seeking to capitalize on Mr. Harris's concession that the Merit Quest contracts were securities.

His investors' efforts to amend their complaints in 2001 to assert an unregistered securities claim came as no real surprise to Mr. Harris because he had been repeatedly accused of selling unregistered securities without a license since 1999.[23] In addition, permitting his investors to amend their complaint did not unduly complicate the trial. Mr. Harris's concession that the Merit Quest contracts were securities actually rendered the investors' case far less complex because proving that these contracts were securities would have been the most difficult and complex part of the investor's case.[24]

Finally, denying the motion to amend would have significantly impaired the investors' abilities to recover damages from Mr. Harris in light of the patent shortcomings in their other claims. The consumer protection claims were legally flawed because the Tennessee Consumer Protection Act does not apply to securities transactions governed by the Tennessee Securities Act of 1980. Their breach of contract claims based on Mr. Harris's personal guarantee were undermined by the undisputed fact that Mr. Harris had ceased giving personal guarantees by the time that Messrs.

---

[22]Tenn. R. Civ. P. 8.01 affords plaintiffs wide latitude in pleading claims for alternative relief. *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 906 (Tenn. 1999).

[23]The Division of Securities' October 1999 cease and desist order accused Mr. Harris of selling unregistered securities without a license. In addition, the Hardcastles' and Mr. Provance's consumer protection claims rested on allegations that Mr. Harris had sold them unregistered securities. The civil warrant Mr. Pope filed in May 2001 specifically alleged that Mr. Harris had violated the Tennessee Securities Act of 1980.

[24]As a result of Mr. Harris's concession, his investors were only required to prove (1) that the Merit Quest contracts had not been registered as securities, (2) that Mr. Harris and his agents were not licensed to sell securities in Tennessee, and (3) that Mr. Harris and his agents actually sold Merit Quest contracts in Tennessee. These factual issues are straightforward. Mr. Harris had never denied that he and his agents had sold Merit Quest contracts in Tennessee. He also had admitted that the Merit Quest contracts had not been registered as securities and that neither he nor his agents were licensed to sell securities in Tennessee.

Provance and Pope invested in Merit Quest and the Hardcastles made their second investment. Likewise, the investors' fraud and misrepresentation claims lacked evidence that any of the investors acted reasonably by relying on the representations of Mr. Harris and his agents.[25]

In summary, we conclude that the trial court did not err by granting the investors' motion to amend their complaints to add an unregistered securities claim. This amendment did not unduly complicate the case and did not require extensive additional discovery or other trial preparation. Mr. Harris had been aware for approximately two years that the sale of Merit Quest contracts was considered to be a sale of unregistered securities, and at least one of the investors had already alleged that he had violated the Tennessee Securities Act of 1980. Thus, Mr. Harris was not unfairly surprised by the amended claim, nor was it unjust to require him to defend the claim at trial.

**D.**

Mr. Harris also insists that the Hardcastles and Mr. Provance waived their unregistered securities claim because their lawyer deliberately omitted it from their original complaints. This argument is not well-taken. While the Tennessee Rules of Civil Procedure require claims and defenses to be raised in a timely manner,[26] they do not necessarily require plaintiffs to include all their claims in their original complaint nor defendants to include all their defenses in their original answer.[27] Thus, claims not included in an original complaint may still be asserted if they are raised in a timely manner or are tried by consent under Tenn. R. Civ. P. 15.02.

Whether a claim has been asserted in a timely manner must be determined with reference to the applicable procedural rules. The Tennessee Rules of Civil Procedure are sufficiently flexible to permit the parties to modify their claims and defenses as the exigencies of the case require. Because these modifications generally take the form of amendments to the pleadings, the timeliness of asserting a new claim or defense should be judged using Tenn. R. Civ. P. 15.01 standards, and the courts should conclude that a new claim or defense is untimely only if the party asserting it would not be entitled to amend its pleading under Tenn. R. Civ. P. 15.01. As we have already determined in the above section, the trial court properly granted the investors' motion to amend their complaints to add a claim based on violations of the Tennessee Securities Act of 1980. Therefore, because the investors' motion to amend was timely under Tenn. R. Civ. P. 15.01, they did not waive their right to seek damages from Mr. Harris for selling unregistered securities without a license.

---

[25]Reasonable reliance on the defendant's representations is an essential ingredient in both fraud and negligent misrepresentation claims. *See Robinson v. Omer*, 952 S.W.2d 423, 427 (Tenn. 1997) (negligent misrepresentation); *Hodges v. S. C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992) ("fraud").

[26]*Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 300 (Tenn. Ct. App. 2001).

[27]*George v. Building Materials Corp.*, 44 S.W.3d 481, 487 (Tenn. 2001) (holding that failure to specifically plead an affirmative defense will not result in a waiver if the opposing party is given fair notice of the defense and an opportunity to refute it). *See also Tips Package Store, Inc. v. Commercial Ins. Managers, Inc.*, 86 S.W.3d 543, 553 (Tenn. Ct. App. 2001).

**E.**

As a final challenge to the trial court's decision to permit the investors to amend their complaints, Mr. Harris insists that the trial court erred by refusing to continue the trial after it granted the investors' motion to amend. While a trial court may grant a continuance to enable a party to respond effectively to an amended pleading, *Gardiner v. Word*, 731 S.W.2d at 890; *Welden v. Wylie*, 645 S.W.2d 247, 250 (Tenn. Ct. App. 1982), these decisions are discretionary. *Blake v. Plus Mark, Inc.*, 952 S.W.2d 413, 415 (Tenn. 1997). Appellate courts will not second-guess a trial court's decision regarding a continuance unless the record, reviewed as a whole, shows a clear abuse of discretion or that a clear prejudicial error has been committed. *Blake v. Plus Mark, Inc.*, 952 S.W.2d at 415; *Nagarajan v. Terry*, ___ S.W.3d ___, ___, 2003 WL 23094223, at *4 (Tenn. Ct. App. 2003) *perm. app. denied* (Tenn. 2004).

The trial court did not err when it denied Mr. Harris's motion to continue the trial. Mr. Harris did not need additional time to defend against his investors' claims that he had sold unregistered securities without a license. He had known since October 1999 that the Merit Quest contracts were considered to be unregistered securities. In addition, as the trial approached, he decided to limit his exposure by conceding that the Merit Quest contracts were securities. While this strategy successfully undermined the treble damage claim under the Tennessee Consumer Protection Act, it provided a basis for his investors to claim that he had sold unregistered securities. Under these facts, Mr. Harris was not prejudiced by the trial court's denial of his request for a continuance.

**IV.**
**THE TIMELINESS OF THE INVESTORS' UNREGISTERED SECURITIES CLAIMS**

Mr. Harris insists that the trial court erred by concluding that he was equitably estopped from asserting a statute of limitations defense against the unregistered securities claims of the Hardcastles and Messrs. Provance and Pope. Optimistic about the success of his equitable estoppel argument, he also asserts that the Hardcastles' and Mr. Provance's unregistered securities claims did not relate back to their original complaints under Tenn. R. Civ. P. 15.03 and that the original claims filed by Messrs. Provance and Pope were not timely filed. We have determined that the trial court properly invoked the doctrine of equitable estoppel to prevent Mr. Harris from asserting statute of limitations defenses in this case.

**A.**

The doctrine of equitable estoppel may be applied to prevent a defendant who has actively induced a plaintiff to delay filing suit from asserting a statute of limitations defense. *Fahrner v. S.W. Mfg., Inc.*, 48 S.W.3d 141, 145 (Tenn. 2001). When the doctrine is applied, it prevents a party from asserting what would otherwise be a valid statute of limitations defense. *See FDIC v. Fonseca*, 759 F.2d 1102, 1107 (1st Cir. 1986). Thus, as the Tennessee Supreme Court has observed, parties invoking the doctrine of equitable estoppel are essentially asking the court to waive the statute of limitations with regard to their claim. *Fahrner v. S.W. Mfg., Inc.*, 48 S.W.3d at 164.

-12-

The courts should not be too quick to invoke the doctrine of equitable estoppel to prevent a defendant from asserting an otherwise valid statute of limitations defense. Statutes of limitations are favored because they promote the timely pursuit of legal rights by suppressing stale claims. *Brown v. Hipshire*, 553 S.W.2d 570, 571 (Tenn. 1977); *Stephens v. May*, 3A Tenn. (2 Cooke) 17, 24-25 (1814). At the same time, estoppels are not favored when they prevent parties from asserting claims or defenses to which they would otherwise be entitled. *Rogers v. Coleville*, 145 Tenn. 650, 659, 238 S.W. 80, 83 (1922). Thus, determining whether to invoke equitable estoppel requires the courts to examine the facts and circumstances of the particular case, *Pierce v. Metropolitan Life Ins. Co.*, 307 F. Supp. 2d 325, 334 (D.N.H. 2004), to determine whether the defendant's conduct is sufficiently unfair or misleading to outweigh the public policy favoring statutes of limitations. *Gonzales v. Tesky*, 465 N.W.2d 525, 530 (Wis. Ct. App. 1990).

The party invoking the doctrine of equitable estoppel bears the burden of proof. *Pierce v. Metropolitan Life Ins. Co.*, 307 F. Supp. 2d at 334; *see also Carlton v. Davis*, No. M2002-01189-COA-R3-CV, 2003 WL 1923825, at *5 (Tenn. Ct. App. Apr. 24, 2003), *perm. app. denied* (Tenn. Oct. 6, 2003); *Bokor v. Holder*, 722 S.W.2d 676, 680 (Tenn. Ct. App. 1986). The focus of the inquiry is on the defendant's conduct and the reasonableness of the plaintiffs' reliance on that conduct. *Fahrner v. S.W. Mfg., Inc.*, 48 S.W.3d at 146; *see also Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883, 891 (6th Cir. 2004); *Hentosh v. Herman M. Finch Univ.*, 167 F.3d 1170, 1174 (7th Cir. 1999); *Bradley v. Williams*, 465 S.E.2d 180, 184-85 (W.Va. 1995).

To prevail, a plaintiff must demonstrate that the defendant lulled it into putting off filing its suit by conduct, suggestions, or assurances that the defendant knew or should have known would induce the plaintiff to delay filing suit. *Fahrner v. S.W. Mfg., Inc.*, 48 S.W.3d at 145. *See also Micromuse, Inc. v. Micromuse, PLC*, 304 F. Supp. 2d 202, 211-12 (D. Mass. 2004); *Riley v. Presnell*, 565 N.E.2d 780, 787 (Mass. 1991). Actual fraud, bad faith, or intent to mislead or deceive on the part of the defendant is not necessary to invoke equitable estoppel. *Church of Christ v. McDonald*, 180 Tenn. 86, 95, 171 S.W.2d 817, 821-22 (1943); *Covington v. McMurry*, 4 Tenn. Civ. App. (Higgins) 378, 394 (1913). Plaintiffs must also demonstrate that their delay in filing suit was not attributable to their own lack of diligence, *see Netzer v. Continuity Graphic Assocs., Inc.*, 963 F. Supp. 1308, 1316 (S.D.N.Y. 1997), and that the delay was not unreasonably prolonged. *Muhammed v. Welch*, 675 N.W.2d 402, 407 (N.D. 2004).

Evidence of vague statements or ambiguous behavior by a defendant will not carry the day for a plaintiff asserting equitable estoppel. The plaintiff must identify specific promises, inducements, representations, or assurances by the defendant that reasonably induced the plaintiff to delay filing suit. *Guerrero v. Gates*, 357 F.3d 911, 919 (9th Cir. 2004); *Nolde v. Frankie*, 964 P.2d 477, 481 (Ariz. 1998). In addition to written or spoken words, the defendant's conduct may also provide a basis for invoking equitable estoppel. *Frayser v. Dentsply Int'l, Inc.*, 78 S.W.3d 242, 248 (Tenn. Sp. Workers Comp. 2002).

The most commonly cited examples of conduct supporting the invocation of equitable estoppel to defeat a statute of limitations defense are (1) a promise not to plead the statute of limitations, *e.g., Fahrner v. S.W. Mfg., Inc.*, 48 S.W.2d at 145; (2) a promise to pay or otherwise satisfy the plaintiff's claim without filing suit, *e.g., Brick Church Transmissions, Inc. v. Southern*

*Pilot Ins. Co.*, 140 S.W.3d 324, 335 (Tenn. Ct. App. 2003); or (3) encouraging the plaintiff not to pursue available legal remedies. *J.R. Hale & Sons v. R.C. Stone Eng'g Co.*, 14 Tenn. App. 461, 472 (1932).[28]   Of specific relevance to this case, a number of courts have invoked the doctrine of equitable estoppel when the plaintiff delayed filing suit as a result of the defendant's representations that it would settle the plaintiff's claim without litigation following the conclusion of another legal proceeding between the defendant and a third party. *Rupley v. Huntsman*, 324 P.2d 19, 23 (Cal. Ct. App. 1958); *Duke Univ. v. Stainback*, 806, 808 (N.C. Ct. App. 1987).  *See also Garfield v. Clark*, 567 P.2d 777, 781 (Alaska 1977) (declining to invoke equitable estoppel because the plaintiffs did not allege that the defendant offered to settle the dispute should the coverage issue be adjudicated in their favor in another suit).

## B.

Between January and August 2000, Mr. Harris sent a series of written communications to his investors informing them that he and others were working on their behalf to recover their money. In a January 18, 2000 letter, Mr. Harris stated that he and another investor believed that "they can work out this situation without involving the court system."  He closed this letter with the following admonition:

> I want to ask anyone who is reading this to call me . . . before taking any action to the courts or regulatories.  It is my understanding, that the excuse used by the traders for holding the money is because of an investor intervention.  It may prove to be very costly to everyone if someone else gets hyper.  We feel we are moving in the right direction and expect an ending to this ordeal very soon.

Less than one month later, on February 4, 2000, Mr. Harris informed the investors that he had "retained a large Nashville law firm to represent us concerning the Insurance Commission's Cease & Desist," that he had "signed [the] necessary paperwork for trial proceedings against Ron Hogsed," and that "[w]e are proceeding as quickly as possible to settled [sic] this matter."  Like his earlier letter, Mr. Harris included the following:

> I feel it best that we all stand together as a group.  We have a strong case, good representation, and powerful evidence.  Darlyn [Ms. Harris] and I have worked full time on this since Ron failed to pay the October 15th trade payment.  The suit is prepared and will be filed when our attorneys give the green light.  Don't misunderstand, anyone has the right to sue Ron, if they so desire.  I am available to discuss why your staying with the group is less expensive, more profitable, and more likely of receiving payment.

---

[28]Other courts have also invoked the doctrine of equitable estoppel upon proof of a defendant's affirmative statements that the statute of limitations period was longer than it actually was, *Paredes v. Princess Cruise, Inc.*, 1 F. Supp. 2d 87, 91 (D. Mass. 1998); *Livingston v. Diocese of Cleveland*, 710 N.E.2d 330, 339 (Ohio Ct. App. 1998), or a defendant's continuation of settlement negotiations in bad faith. *ALI, Inc. v. Generall*, 954 F. Supp. 118, 121 (D.N.J. 1997).

Mr. Harris's April 10, 2000 letter continued the same theme. He informed the investors that he had retained a new law firm and that "[t]he lawsuit [against Mr. Hogsed] was filed March 30th." He also stated that:

> As of this date we are working from three different angles. First of all we are working to supply all the information the State needs for the Merit Quest hearing in May. Secondly, our lawyers are pushing to collect the principal investments from Herculese [sic] Holdings/Bond Partnership's Attorney in Houston. Thirdly, we have filed the lawsuit against Mr. Hogsed for collection of all earnings (through date of payment) and principal, if it has not been paid by the court date.
>
> As a personal note, my wife and I have worked on the collecting of these funds almost exclusively since October 15, 1999. We currently have retained three law firms and expended many thousands of dollars. We personally have invested with Mr. Hogsed $210,000. Several of my family members are investors in the program. Don't think for a minute we will leave one rock unturned until this matter is resolved.

Finally, in an "update" dated August 11, 2000, Mr. Harris informed the investors that he had talked with the "London Metro Police" and that he understood that all the money had been traced and had been "frozen in place." He also stated that "[a]ll investors should understand that their principal and interest are being sought in a 'Master lawsuit' against 'Merit Quest' (Ron Hogsed). When paid, we expect to disburse proportionally to investor's contract dates and their amount of investment."

## C.

Mr. Harris' investors knew or should have known about the Division of Securities' cease and desist order against Mr. Harris and Merit Quest by no later than December 1999. Therefore, based on the allegations in the cease and desist order, they knew or should have known that Mr. Harris had violated the Tennessee Securities Act of 1980 by selling the Merit Quest contracts. Thus, in light of the statute of limitations in Tenn. Code Ann. § 48-2-122(h) existing at the time, Mr. Harris's investors should have filed their securities act claims by December 2000.

The Hardcastles' original complaint was filed within the statutory limitations period but did not contain a securities act claim. This oversight was cured when the Hardcastles amended their complaint to add a securities act claim.[29] Mr. Pope's complaint contained a securities act claim but

---

[29]The amendment to the Hardcastles' complaint related back to the date of the filing of their original complaint. Pursuant to Tenn. R. Civ. P. 15.03, an amended complaint relates back to the original complaint as long as it "arose out of the conduct, transaction, or occurrence set forth . . . in the original pleading," regardless of whether the amended claim states a new cause of action. *Hawk v. Chattanooga Orthopaedic Group, P.C.*, 45 S.W.3d 24, 31 (Tenn. Ct. App. 2000). The language of Tenn. R. Civ. P. 15.03 is so clear that it is "virtually self-executing." *Karash v. Pigott*, 530 S.W.2d 775,

(continued...)

was plainly filed after the limitation period had expired. It is also likely that Mr. Provance's complaint, which did not contain a securities act claim, was not timely filed. Therefore, the fate of Messrs. Provance's and Pope' securities act claim rests on the correctness of the trial court's conclusion that Mr. Harris should be equitably estopped to assert a statute of limitations defense.

After the Merit Quest program was shut down by the Division of Securities' cease and desist order, Mr. Harris deliberately set out to dissuade his investors, including Messrs. Provance and Pope, from pursuing independent legal action. He represented to them that he had commenced various legal proceedings on their behalf and that there was a good prospect that their investments would be returned to them as a result of the proceedings he had instigated. Mr. Harris also represented to his investors that their interests would be best served by "staying with the group" and by not pursuing legal remedies on their own. Messrs. Provance and Pope did not act unreasonably by putting off their own legal proceedings in reliance on Mr. Harris representations that his efforts would result in the return of their investments. They did not delay commencing their proceedings beyond the point when a reasonable person would no longer believe Mr. Harris representations. Accordingly, based on these facts, the trial court correctly determined that Mr. Harris had "lulled the investors into a false sense that was taking legal action on their behalf."

## V.
### THE EVIDENTIARY SUPPORT OF THE UNREGISTERED SECURITIES CLAIMS

Mr. Harris insists that he should not be held civilly liable to his investors because they failed to prove that he actually knew that the Merit Quest contracts were unregistered securities when he sold them. His argument is based on his understanding that Tenn. Code Ann. § 48-2-122(a)(1)(A) (Supp. 2004) conditions civil liability on the seller's actual knowledge that a security is unregistered. Mr. Harris's interpretation of Tenn. Code Ann. § 48-2-122(a)(1)(A) is incorrect.

### A.

Tennessee's securities statutes are remedial and should be construed broadly to effectuate their purpose. *King v. Pope*, 91 S.W.3d 314, 323 (Tenn. 2002); *State v. Brewer*, 932 S.W.2d 1, 10 (Tenn. Crim. App. 1996). Like other statutes, the court's responsibility is to ascertain and then to give the fullest possible effect to the General Assembly's purpose in enacting the statute as reflected in the statute's language. *Stewart v. State*, 33 S.W.3d 785, 790-91 (Tenn. 2000); *Lavin v. Jordon*, 16 S.W.3d 362, 365 (Tenn. 2000). In doing so, we must avoid constructions that unduly expand or restrict the statute's application. *Watt v. Lumbermens Mut. Cas. Ins. Co.*, 62 S.W.3d 213, 218 (Tenn. 2001); *Patterson v. Tennessee Dep't of Labor & Workforce Dev.*, 60 S.W.3d 60, 64 (Tenn. 2001).

Our construction of a statute is more likely to harmonize with the General Assembly's purpose if we approach the statute presuming that the General Assembly chose its words purposely and deliberately, *Tidwell v. Servomation-Willoughby Co.*, 483 S.W.2d 98, 100 (Tenn. 1972);

---

[29] (...continued)
777 (Tenn. 1975). Accordingly, the trial court correctly determined that the Hardcastles' amended complaint related back to the filing of their original complaint.

*Merrimack Mut. Fire Ins. Co. v. Batts*, 59 S.W.3d 142, 151 (Tenn. Ct. App. 2001), and that the words chosen by the General Assembly convey the meaning that the General Assembly intended them to convey. *Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d at 83; *BellSouth Telecomms., Inc. v. Greer*, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997). Thus, we must construe statutes as we find them, *Jackson v. Jackson*, 186 Tenn. 337, 342, 210 S.W.2d 332, 334 (1948); *Pacific Eastern Corp. v. Gulf Life Holding Co.*, 902 S.W.2d 946, 954 (Tenn. Ct. App. 1995), and our search for a statute's purpose must begin with the words of the statute itself. *Blankenship v. Estate of Bain*, 5 S.W.3d 647, 651 (Tenn. 1999).

We must give a statute's words their natural and ordinary meaning unless the context in which they are used requires otherwise. *Frazier v. East Tenn. Baptist Hosp.*, 55 S.W.3d at 928; *Mooney v. Sneed*, 30 S.W.3d 304, 306 (Tenn. 2000); *State v. Fitz*, 19 S.W.3d 213, 216 (Tenn. 2000). Because words are known by the company they keep, we should construe the words in a statute in the context of the entire statute and in light of the statute's general purpose. *State v. Flemming*, 19 S.W.3d 195, 197 (Tenn. 2000); *Lyons v. Rasar*, 872 S.W.2d 895, 897 (Tenn. 1994); *Wachovia Bank of N.C. v. Johnson*, 26 S.W.3d 621, 624 (Tenn. Ct. App. 2000). When the meaning of statutory language is clear, we must interpret it as written, *Kradel v. Piper Indus., Inc.*, 60 S.W.3d 744, 749 (Tenn. 2001); *ATS Southeast, Inc. v. Carrier Corp.*, 18 S.W.3d 626, 629-30 (Tenn. 2000), rather than using the tools of construction to give the statute another meaning. *Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73, 83 (Tenn. 2001); *Gleaves v. Checker Cab Transit Corp.*, 15 S.W.3d 799, 803 (Tenn. 2000).

**B.**

Tenn. Code Ann. § 48-2-122(a)(1)(A) imposes civil liability on any person who:

> [s]ells a security in violation of §§ 48-2-104 – 48-2-109, 48-2-110(f), or of any condition imposed under § 48-2-107(f), or any rule, or order under this part of which the person has notice.

Mr. Harris asserts that the notice requirement applies to the entire statute. We disagree for two reasons. First, Mr. Harris's interpretation is at odds with the generally applicable rules of grammar and punctuation. Second, the notice requirement in the statute, even if it were applicable, is broad enough to include actual and constructive notice.

The structure of Tenn. Code Ann. § 48-2-122(a)(1)(A) consists of a series of independent of statutory or regulatory restrictions the violation of which may give rise to civil liability. Each element of this series is separated by ", or"[30] which creates some ambiguity regarding which restriction or restrictions are modified by the concluding phrase "of which the person has notice."

---

[30]The combination of the repeated use of the conjunction "or" and the preceding comma is inconsistent with a basic rule of punctuation and grammar. No comma is needed if all the elements in the series are joined by conjunctions. BRYAN A. GARNER, THE REDBOOK: A MANUAL ON LEGAL STYLE § 1.3(c) (2002). Because we must presume that the General Assembly chose its words carefully and crafted the statute deliberately, we must presume that, by using ", or" the General Assembly did not intend all of the independent elements in Tenn. Code Ann. § 48-2-122(a)(1)(A) to be in the same series.

We have determined that the phrase "of which the person has notice" applies only to "any condition imposed under § 48-2-107(f), or any rule, or order under this part" for two reasons. First, the General Assembly's repetitive use of the preposition "of" reflects an intention to distinguish between violations of "§§ 48-2-104 – 48-2-109, 48-110(f)" and violations of "any condition imposed under § 48-2-107(f), or any rule, or order." Second, the former violations are statutory, while the latter involve violations of a rule or order issued by the Division. The General Assembly could reasonably have decided to apply the notice requirement to administrative actions by the Division but not to violations of the Securities Act of 1980 itself.

As a general matter, a seller's lack of knowledge of a state's securities laws does not excuse the sale of an unregistered security. *See e.g., Hogg v. Jerry*, 773 S.W.2d 84, 86 (Ark. 1989). Thus, a seller's lack of knowledge of the registration requirement is irrelevant with regard to civil liability for selling unregistered securities. *In re McDowell*, 87 B.R. 554, 559 (Bankr. S.D. Ill. 1988); *Heilbron v. ARC Energy Corp.*, 757 S.W.2d 294, 296 (Mo. Ct. App. 1988). Accordingly, the seller of an unregistered security may be held civilly liable for the sale if he or she knew, or through the exercise of reasonable diligence should have known, that the securities should have been registered. *Chiles v. M.C. Capital Corp.*, 642 N.E.2d 1115, 1123 (Ohio Ct. App. 1994).

The notice requirement in Tenn. Code Ann. § 48-2-122(a)(1)(A) did not apply to Mr. Harris because he violated the statutory prohibition against the sale of unregistered securities and the statutory prohibition against selling securities without a license. Thus, his professed ignorance that the Merit Quest contracts were investment contracts, and therefore securities as defined in Tenn. Code Ann. § 48-2-102(16) (Supp. 2004), cannot shield him from liability to his investors. Even if the notice requirement were applicable, Mr. Harris, as a self-professed expert knowledgeable in this particular business opportunity, should have known that the Merit Quest contracts were securities and that they were not exempt from registration under the Tennessee Securities Act of 1980.

## VI.
### THE AWARD FOR ATTORNEY'S FEES

As a final matter, Mr. Harris asserts that the trial court erred by awarding the Hardcastles and Messrs. Provance and Pope an additional $44,979.50 for attorney's fees and expenses. He claims that he should not be required to pay attorney's fees because he did not have adequate notice that his investors were seeking attorney's fees under the Tennessee Securities Act of 1980. We disagree for two reasons. First, Mr. Harris knew as early as July 2000 that his investors were seeking to recover attorney's fees. Second, the investors' amended complaints contained specific requests for attorney fees under the Tennessee Securities Act.

Both of the original complaints filed by the Hardcastles in July 2000 and the original complaint filed by Mr. Provance five months later requested an award of attorney's fees under the Tennessee Consumer Protection Act. Mr. Pope's original civil warrant filed in May 2001 included a securities claim and sought attorney's fees. The amended complaints filed by the Hardcastles and Mr. Provance in October 2001 included a securities claim and specifically requested attorney's fees under the Tennessee Securities Act of 1980. Thus, Mr. Harris knew since July 2000 that one or more of his investors intended to seek attorney's fees. He also knew as early as May 2001 – five months

prior to the trial – that at least one of his investors was seeking attorney's fees under the Tennessee Securities Act of 1980.

The fundamental purpose of the pleading requirement in Tenn. R. Civ. P. 9.07 is notice. *Keisling v. Keisling*, 92 S.W.3d 374, 377 (Tenn. 2002); *Castelli v. Lien*, 910 S.W.2d 420, 429 (Tenn. Ct. App. 1995). Because claims for attorney's fees are "fairly unusual," *Marshall v. First Nat'l Bank of Lewisburg*, 622 S.W.2d 558, 561 (Tenn. Ct. App. 1981), a claim for attorney's fees must be specifically pleaded under Tenn. R. Civ. P. 9.07. *Cross v. McCurry*, 859 S.W.2d 349, 353 (Tenn. Ct. App. 1993). Thus, prudent lawyers seeking to recover attorney's fees should include a specific request for attorney's fees in their pleadings that includes a specific reference to the contractual, statutory, or other substantive basis for an award of attorney's fees.

Many courts, however, have held that a general claim for attorney's fees that does not include the legal basis for the claim satisfies the requirements of rules similar to Tenn. R. Civ. P. 9.07. *See e.g., Caufield v. Cantele*, 837 So.2d 371, 377-78 (Fla. 2002); *Mitchell v. La Flamme*, 60 S.W.3d 123, 130 (Tex. App. 2000). Tennessee's courts have been even more relaxed. For example, this court has upheld an award for attorney's fees under the Tennessee Consumer Protection Act even though the consumer did not include a specific request for attorney's fees in his complaint. The court reasoned that the consumer protection claim by itself put the defendant on notice that it could be required to pay the consumer's attorney's fees because attorney's fees were, by statute, an element of damages in the consumer protection case. *Killingsworth v. Ted Russell Ford, Inc.*, 104 S.W.3d 530, 533-34 (Tenn. Ct. App. 2002).[31]

Under the circumstances of this case, Mr. Harris had adequate notice that his investors were seeking to recover their attorney's fees, even if the basis for this recovery changed. He knew two years before trial that his investors were seeking attorney's fees under the Tennessee Consumer Protection Act, and he knew five months before trial that at least one of his investors was seeking attorney's fees under the Tennessee Securities Act of 1980. Thus, he was not unfairly prejudiced when the trial court permitted the remaining investors to amend their complaints shortly before trial to include a securities claim and to recover attorney's fees under the Tennessee Securities Act of 1980.

# VII.
## THE DISMISSAL OF THE INVESTORS' FRAUDULENT MISREPRESENTATION CLAIMS

We need not tarry long with the investors' argument that the trial court erred by dismissing their fraudulent misrepresentation claim. It is only sketchily briefed, and it does not address the basis for the trial court's decision. No claim for fraud or fraudulent misrepresentation can succeed without some proof that the injured party or parties reasonably relied on the false representations of the

---

[31]The Tennessee Supreme Court has even upheld an award of attorney's fees under 42 U.S.C.A. § 1988 (1991) even though the plaintiff did not specifically plead or rely on 42 U.S.C. § 1983 (1991). *Bloomingdale's By Mail v. Huddleston*, 848 S.W.2d 52, 56 (Tenn. 1992). Although the opinion does not say so, we presume that the taxpayer in the case sought to recover attorney's fees under Tenn. Code Ann. § 67-1-1803(d) (2003), which permits prevailing taxpayers to recover attorney's fees in litigation seeking a tax refund.

defendant. *Robinson v. Omer*, 952 S.W.2d at 427; *Hodges v. S. C. Toof & Co.*, 833 S.W.2d at 901. The evidence proves that the investors acted impetuously and imprudently when they purchased their Merit Quest contracts. All of the investors conceded that they believed that Mr. Harris's claims regarding the return on their investment were inflated and that they did not read most of the contract documents submitted to them before they purchased their Merit Quest contract. Yet, none of them sought independent advice before getting involved in Mr. Harris's get-rich-quick scheme. The evidence in this case supports the trial court's conclusion that none of the investors reasonably relied on Mr. Harris's representations regarding the amount of return on their investment or the safety of their principal. Without evidence of reasonable reliance, the investors' fraudulent misrepresentation claims must fail.

## VIII.

We affirm the judgment and remand the case to the trial court for further proceedings consistent with this opinion. We tax the costs of this appeal to Frank Harris and his surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., J.