IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 3, 2018 Session

## SCOTT A. PADGETT v. CLARKSVILLE-MONTGOMERY COUNTY SCHOOL SYSTEM, ET AL.

**Appeal from the Circuit Court for Montgomery County**
**No. MC-CC-CV-OD-14-1063      Ross H. Hicks, Judge**

_____

### No. M2017-01751-COA-R3-CV

_____

A teacher dismissed from his teaching position filed suit against the school system and the chief human resources officer for libel and breach of contract. The trial court denied the teacher's motion for leave to file an amended complaint and granted the defendants' motions for summary judgment as to both claims. Finding no error, we affirm the decision of the trial court in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and RICHARD H. DINKINS, J., joined.

David Lee Cooper, Nashville, Tennessee, for the appellant, Scott A. Padgett.

Kathryn Wall Olita, Clarksville, Tennessee, for the appellees, Montgomery County, Tennessee and Jeanine Johnson.

### OPINION

FACTUAL AND PROCEDURAL BACKGROUND

Scott Padgett taught English at Montgomery Central High School from 2004 until May 2013 and was employed by the Clarksville Montgomery County School System ("CMCSS").[1] Until 2009, he also coached the school's cross-country team. Mr. Padgett ran a boarding house on the second floor of his home and in a garage apartment and pool house on his property. He provided housing for young men, usually college students, in exchange for modest rent and chores. Paul Devers was an eighteen-year-old student in

_____

[1] This case was decided by the trial court at the summary judgment stage. Unless otherwise indicated, our recitation of the facts is based upon the parties' statements of undisputed material facts and responses.

Mr. Padgett's class during the 2012-2013 school year. The events at issue in this case began on May 1, 2013.

During the 2012-2013 school year, teachers and staff members at Montgomery County Central High were aware of Paul Devers's complaints that his mother, who was a bus driver, did not provide him with enough food or money to buy food, and there were some teachers who gave him food or money. On May 1, 2013, a teacher told Mr. Padgett that Paul was again complaining that he did not have enough to eat and saying that his mother was threatening to kick him out of the house. Mr. Padgett discussed with fellow teachers the possibility that he could help Paul by paying him to clean carpets at his house and show him the available rooms in case his mother kicked him out of their home. One of the teachers relayed this information to Paul, who later told Mr. Padgett that he wanted to earn some money and that he had his mother's permission to go to Mr. Padgett's home.

Mr. Padgett often ran after school, sometimes with students on the cross-country team. Paul asked if he could run with Mr. Padgett and two other students. After the run, Mr. Padgett and Paul needed to change clothes, and Mr. Padgett told Paul he could change in his classroom or in the school restroom; Paul chose to change in Mr. Padgett's classroom. According to Mr. Padgett, he and Paul had their backs to one another when they changed clothes, and he never observed Paul in any state of undress. Mr. Padgett told Paul that, if he removed his sweaty running clothes, including his underwear, Mr. Padgett would wash them when they arrived at his house. Paul gave all of his dirty running clothes to Mr. Padgett, and Mr. Padgett washed them after they arrived at his home.

Once Pamela Devers, Paul's mother, learned that her son had left school with Mr. Padgett, she became upset. She called an assistant principal and complained that she had not given permission for her son to leave school with Mr. Padgett. Ms. Devers denied threatening to kick her son out of their house. The assistant principal called Mr. Padgett and informed him that Ms. Devers was upset and that he needed to bring Paul back to the school. It was at this point that Mr. Padgett learned that Paul had not received his mother's permission to travel with him to his house.[2] Paul and Mr. Padgett returned to school.

Jeanine Johnson, the Chief Human Resources Officer, was out of town when this incident occurred, so Human Resources Director Cydney Miller and Principal Christy Houston conducted an investigation concerning the incident. On May 2, 2013, Principal

---

[2] School policy prohibited school employees from transporting CMCSS students in their personal vehicles. The parties disagree, however, as to whether the school system regularly allowed exceptions to this policy.

Houston and Ms. Miller interviewed witnesses, including Mr. Padgett and Paul Devers. The next day, the principal presented Mr. Padgett with a written reprimand containing a recommended three-day suspension. The letter asserted that Mr. Padgett had "acted with a gross error in judgment with regard to being alone with an adult student after school hours" and that he "acted on unverified information and transported that student in [his] personal vehicle." Mr. Padgett completed the three-day unpaid suspension from May 3, 2013, to May 7, 2013.

On May 6, 2013, Ms. Devers requested a meeting with Dr. B.J. Worthington, Director of Schools for CMCSS. This meeting occurred later that day and was attended by Dr. Worthington, Mr. and Ms. Devers, Paul, and Ms. Miller. Ms. Devers informed Dr. Worthington and Ms. Miller about rumors that Mr. Padgett had engaged in inappropriate conduct with other students, whose names she supplied. In accordance with an agreement with local law enforcement, CMCSS subsequently contacted the Montgomery County Sheriff's office.

Principal Houston, Ms. Johnson, and Ms. Miller met with Mr. Padgett on May 7 and advised him that his work site was changed to his residence pending further investigation. The school officials did not inform Mr. Padgett of the new allegations made by Ms. Devers. In a letter dated May 7, 2013, confirming his new work site, Ms. Johnson stated: "When the investigation is complete you will be contacted, the situation will be reviewed and the appropriate action taken."

On May 8, 2013, despite an ongoing investigation by the sheriff's department, Ms. Miller and Ms. Johnson telephoned a former CMCSS student, Chris M., with whom Ms. Devers alleged Mr. Padgett had engaged in inappropriate conduct. Chris reportedly told them that, when he showered at Mr. Padgett's home eight or nine years earlier after having worked at the home, Mr. Padgett walked naked into the shower with him. Ms. Miller and Ms. Johnson conveyed this information to the lead investigator at the sheriff's department. Dr. Worthington and Ms. Johnson met with Mr. Padgett on May 13 and told him that the investigation was ongoing; he still was not informed of the allegations by Ms. Devers and Chris M. Nevertheless, Ms. Johnson had concluded that Chris's allegations were true and that, in her opinion, Mr. Padgett's teaching license should be revoked.

By law, CMCSS was required to send reports concerning its discipline of teachers to the State Board of Education, the agency with authority over teacher licensing. On May 14, 2013, Ms. Johnson sent a form entitled, "Director's Report Regarding Teacher/Administrator" regarding Mr. Padgett's suspension on May 3, 2013. In the section concerning the status of the investigation, Ms. Johnson stated that Mr. Padgett had been given a reprimand by the school, "then placed on Alternative worksite due to other information being provided by parent and former student." She further indicated

that the matter had been reported to the Department of Children's Services ("DCS"), "unknown status," and that the sheriff's department was "currently investigating."

The sheriff's department advised Ms. Johnson on or about May 22, 2013, that it would not bring criminal charges against Mr. Padgett as a result of the allegations made by Ms. Devers and Chris M. The CMCSS decided to file formal charges seeking Mr. Padgett's termination at a hearing before the school board. On May 28, 2013, Mr. Padgett and his union representative attended a meeting with Dr. Worthington, Ms. Johnson, and the CMCSS attorney where he was presented with the written charges of dismissal. Although Mr. Padgett learned for the first time that one of his former students had made allegations that he had engaged in inappropriate conduct and some details regarding the alleged conduct, the student's identity was not provided to Mr. Padgett. Mr. Padgett denied engaging in the alleged conduct.

After the meeting, Mr. Padgett hired an attorney, Kimberly Turner, who attended a meeting on Mr. Padgett's behalf on June 7, 2013, with Ms. Johnson, Dr. Worthington, and the CMCSS attorney, Carol Joiner. During the meeting, Ms. Turner asked the CMCSS representatives what would happen to Mr. Padgett if he agreed to resign from his teaching position instead of fighting the charges. She was told that, if Mr. Padgett resigned, CMCSS would take no further action against him and that everything local would stop, but that the State Board of Education would have to be notified of his resignation. According to Ms. Turner's deposition testimony, the CMCSS representatives agreed to keep the written charges out of Mr. Padgett's personnel file and not send them to the State Board if he resigned. The defendants (CMCSS and Ms. Johnson) admit that Ms. Joiner kept the written charges at her law office, but deny that there was any agreement not to produce the information to the State Board. The defendants assert that Mr. Padgett's attorney was informed that the written charges were a public record and subject to disclosure, if requested.

Mr. Padgett elected to resign and completed and signed a resignation form that was delivered to Dr. Worthington. On June 13, 2013, Ms. Johnson acknowledged, by her signature on the resignation form, that Dr. Worthington accepted Mr. Padgett's resignation. Ms. Johnson prepared and sent a form entitled, "Final Report Regarding Teacher/Administrator with Flagged License" to the State Board the same day. With regard to the "status of investigation," Ms. Johnson stated: "investigation ended due to resignation." She listed herself and the investigating officer at the sheriff's department as contacts for further information.

The State Board subsequently sought to revoke Mr. Padgett's teaching license for allegedly engaging in inappropriate conduct with a student. The defendants admit that, pursuant to a subpoena, they provided a copy of the termination charges to the State Board. In a contested case hearing initiated by the State Board, the administrative law judge found no evidence that Mr. Padgett engaged in inappropriate conduct with a

student, and Mr. Padgett retained his license pursuant to an order entered on March 6, 2014.[3]

Mr. Padgett filed this lawsuit against CMCSS and Ms. Johnson on May 27, 2014, alleging causes of action for libel, breach of contract, and intentional infliction of emotional distress. The defendants answered, denying liability. After discovery, the defendants filed a motion for summary judgment on March 29, 2017, with supporting documents. On May 22, 2017, Mr. Padgett filed a motion for leave to file a first amended complaint. Then, on July 21, 2017, Mr. Padgett filed a response in opposition to the defendants' motion for summary judgment.

The trial court heard the motion to amend and the motion for summary judgment on July 28, 2017. In an order dated August 8, 2017, the trial court denied Mr. Padgett's motion for leave to file a first amended complaint and granted the defendants' motion for summary judgment on all claims.

Mr. Padgett appeals, raising three issues: (1) whether the trial court abused its discretion in failing to grant his motion to file the first amended complaint; (2) whether the trial court erred in granting summary judgment to Ms. Johnson in her individual capacity on the libel claim; and (3) whether the trial court erred in granting summary judgment to CMCSS on the breach of contract claim.

ANALYSIS

I. Motion to file amended complaint

A trial court's decision on a motion to amend a pleading under Tenn. R. Civ. P. 15 is reviewed under an abuse of discretion standard. *Conley v. Life Care Ctrs. of Am., Inc.*, 236 S.W.3d 713, 723 (Tenn. Ct. App. 2007); *Fann v. City of Fairview, Tenn.*, 905 S.W.2d 167, 175 (Tenn. Ct. App. 1994). There has been an abuse of discretion "when the trial court reaches a decision against logic that causes a harm to the complaining party or when the trial court applies an incorrect legal standard." *Riley v. Whybrew*, 185 S.W.3d 393, 399 (Tenn. Ct. App. 2005). The trial court's decision will be upheld "'so long as reasonable minds can disagree as to the propriety of the [trial court's] decision.'" *Id.* (quoting *State v. Scott*, 33 S.W.3d 746, 751 (Tenn. 2000)).

Tennessee Rule of Civil Procedure 15.01 provides that leave of court to amend pleadings "shall be freely given when justice so requires." The Tennessee Supreme Court has recognized that the language of Tenn. R. Civ. P. 15.01 "substantially lessens the

---

[3] Mr. Padgett further alleges that he lost a job in Florida after Ms. Devers, Paul Devers's mother and an employee of CMCSS, contacted the school and notified them of the allegations she made against him in Tennessee.

exercise of pre-trial discretion on the part of a trial judge." *Branch v. Warren*, 527 S.W.2d 89, 91 (Tenn. 1975); *see also Hardcastle v. Harris,* 170 S.W.3d 67, 80-81 (Tenn. Ct. App. 2004). Rule 15.01 does not, however, provide that leave to amend "shall be given," only that it "shall be freely given" when justice requires it. *See Waters v. Coker,* No. M2007-01867-COA-RM-CV, 2008 WL 4072104, at *4 (Tenn. Ct. App. Aug. 28, 2008). Once a responsive pleading has been filed, a party is entitled to amend a pleading only with the adverse party's consent or with leave of court, which is within the trial court's discretion to grant or deny. TENN. R. CIV. P. 15.01; *Waters*, 2008 WL 4072104, at *4. In ruling on a motion to amend a complaint, a trial court should consider several factors, including: "1) undue delay in filing, 2) lack of notice to the opposing party, 3) bad faith by the moving party, 4) repeated failure to cure deficiencies by previous amendments, 5) undue prejudice to the opposing party, and 6) futility of amendment." *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 42 (Tenn. Ct. App. 2006) (citations omitted).

In his motion for leave to file an amended complaint, Mr. Padgett asserted that the amendment was "needed to reflect changes in plaintiff's theories of recovery based on information discovered in the depositions of defendant Jeanine [Johnson] and [CMCSS] Director of Schools B.J. Worthington, and analyzed in light of the defendants' pending motion for summary judgment."[4] In denying Mr. Padgett's motion to amend, the trial court relied upon two factors: undue delay and the procedural posture of the case. Citing *March v. Levine*, 115 S.W.3d 892, 909-10 (Tenn. Ct. App. 2003), and other cases addressing undue delay, the trial court emphasized that Mr. Padgett sought to amend the complaint based upon information discovered in depositions that had taken place in December 2014 and August 2015, but did not file his motion for leave to amend until May 2017. The trial court concluded that "[t]he Plaintiff's delay in seeking leave to amend is undue and inexcusable, considering the Plaintiff has known or should have known the basis for his proffered amendments for years."

With respect to the procedural posture of the case, the trial court discussed *Allen v. Saturn Corp.*, No. M2002-01238-COA-R3-CV, 2003 WL 22055959, at *2 (Tenn. Ct. App. Sept. 4, 2003), a personal injury case in which the plaintiffs sought leave to amend the complaint to allege new theories of liability as part of their response to the defendant's motion for summary judgment. The trial court in *Allen* denied the plaintiffs' motion, and this Court affirmed the trial court's decision, noting that "[t]he only explanation for the delay [in the filing of the motion to amend] was that the plaintiffs[ ] had to face Saturn's motion for summary judgment." *Allen*, 2003 WL 22055959, at *3.

---

[4] The proposed first amended complaint alleged that CMCSS made "a series of libelous statements" in its reports to the State Board, rather than the single instance of libel identified in the original complaint. Moreover, the proposed first amended complaint does not include the claim for intentional infliction of emotional distress. Mr. Padgett is not pursuing the claim for intentional infliction of emotional distress on appeal.

Based upon *Allen* and other cases, the trial court in the present case stated that "[i]t is well-settled in Tennessee that a trial court should deny a motion for leave to amend a complaint where the motion is an improper attempt to avoid the entry of summary judgment." *See Gentry v. Wagner*, M2008-02369-COA-R3-CV, 2009 WL 1910959, at *4 (Tenn. Ct. App. June 30, 2009).

We find no abuse of discretion in the trial court's decision to deny Mr. Padgett's motion for leave to file an amended complaint. The trial court based its denial upon "undue delay in seeking to amend and an improper attempt to amend in order to avoid entry of summary judgment."

## II. Libel

Next, Mr. Padgett argues that the trial court erred in granting summary judgment to Ms. Johnson on the claim for libel. Because we have affirmed the trial court's denial of Mr. Padgett's motion to file an amended complaint, his libel claim is based solely upon the statement made by Ms. Johnson in her Final Report to the State Board: "investigation ended due to resignation."

A trial court's award of summary judgment does "not enjoy a presumption of correctness on appeal." *Biancheri v. Johnson*, Nos. M2008-00599-COA-R3-CV, M2007-02861-COA-R3-CV, 2009 WL 723540, at *5 (Tenn. Ct. App. Mar. 18, 2009) (citing *BellSouth Adver. & Publ'g Co. v. Johnson*, 100 S.W.3d 202, 205 (Tenn. 2003)). Appellate courts review a trial court's decision on a motion for summary judgment de novo. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015) (citing *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997)).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." TENN. R. CIV. P. 56.04; *see also Rye*, 477 S.W.3d at 261-62 (quoting TENN. R. CIV. P. 56.04). If the party moving for summary judgment does not bear the burden of proof at trial, as here, the movant will be entitled to succeed on the motion if he or she "affirmatively negat[es] an essential element of the nonmoving party's claim or . . . demonstrate[s] that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense." *Rye*, 477 S.W.3d at 264.

A court ruling on a motion for summary judgment is required to take the "strongest legitimate view of the evidence" in favor of the non-moving party "and discard all countervailing evidence." *Davis v. McGuigan*, 325 S.W.3d 149, 157 (Tenn. 2010) (citing *Blair v. W. Town Mall*, 130 S.W.3d 761, 768 (Tenn. 2004)). A genuine issue of material fact exists "if the undisputed facts and inferences drawn in the [non-movant's]

favor permit a reasonable person to reach more than one conclusion." *Id.* Then, "'if there is a dispute as to any material fact or any doubt as to the conclusions to be drawn from that fact, the motion must be denied.'" *Johnson v. City Roofing Co.*, No. W2003-01852-COA-R3-CV, 2004 WL 1908794, at \*2 (Tenn. Ct. App. Aug. 25, 2004) (quoting *Byrd v. Hall*, 847 S.W.2d 208, 211 (Tenn.1993)); *see also Dooley v. Everett*, 805 S.W.2d 380, 383 (Tenn. Ct. App. 1990).

Tennessee Code Annotated section 49-5-512(b), part of the Tennessee Tenure Law, provides: "The director of schools or other school officials shall not be held liable, personally or officially, when performing their duties in prosecuting charges against any teacher or teachers under this part." *See also Buckner v. Carlton*, 623 S.W.2d 102, 104 (Tenn. Ct. App. 1981), *superseded by statute on other grounds*, 1984 TENN. PUB. ACTS ch. 972, *as recognized in Lucas v. State*, 141 S.W.3d 121, 129, 137 (Tenn. Ct. App. 2004). It is undisputed that investigating allegations of teacher misconduct and sending required reports to the State Board were responsibilities of Ms. Johnson as chief human resources officer.[5] The trial court held that Ms. Johnson was entitled to absolute immunity for the actions at issue in Mr. Padgett's libel claim.

In arguing against the trial court's application of immunity, Mr. Padgett points to Tenn. Code Ann. 29-20-205(2), part of the Governmental Tort Liability Act ("GTLA"). Tennessee Code Annotated section 29-20-205(2) provides that the immunity enacted by the GTLA shall not apply to certain torts, including libel. When two statutes addressing the same question are in conflict, "a more specific statutory provision takes precedence over a more general provision." *Graham v. Caples*, 325 S.W.3d 578, 582 (Tenn. 2010) (citing *Arnwine v. Union Cnty. Bd. of Educ.,* 120 S.W.3d 804, 809 (Tenn. 2003)). The Teacher Tenure Act provision, Tenn. Code Ann. § 49-5-512(b), specifically addresses the immunity of school officials involved in investigating and prosecuting school employees alleged to be guilty of misconduct. We conclude that this provision governs over the more general immunity provisions of the GTLA.

---

[5] Tennessee State Board rules and regulations in effect at the time of the alleged misconduct included the following requirements:

> It is the responsibility of the superintendent of the employing public or non-public school or school system to inform the Office of Teacher Licensing of licensed teachers or administrators who have been suspended or dismissed, or who have resigned, following allegations of conduct which, if substantiated, would warrant consideration for license suspension or revocation under parts (a) or (b).

TENN. COMP. R. & REGS. 0520-02-04-.01(9)(e) (2013). According to an unrebutted affidavit from Philip Cramer, a staff attorney for the State Board, licensure issues that must be reported include "leaving a class unattended, inappropriate relationships with students or cursing at a student."

Mr. Padgett further argues that Ms. Johnson's alleged libelous statement on the Final Report was not part of her duties covered under Tenn. Code Ann. § 49-5-512(b) because, at that point, she was no longer seeking his termination from employment. It is the duty of the State Board, not the local school system, to determine whether a teacher's license should be revoked. Tenn. Code Ann. § 49-1-302(a); *Yokley v. State Bd. of Educ.*, 305 S.W.3d 523, 527 (Tenn. Ct. App. May 19, 2009). Because Ms. Johnson's reporting duties are part of the prosecutorial functions of her job, we find Mr. Padgett's argument on this point to be without merit.

Even if we assume that CMCSS is not immune from suit for libel, we do not find the statement in the Final Report to be libelous. "Libel is written defamation." *Grant v. Commercial Appeal*, No. W2015-00208-COA-R3-CV, 2015 WL 5772524, at *8 (Tenn. Ct. App. Sept. 18, 2015) (citing *Davis v. The Tennessean*, 83 S.W.3d 125, 128 (Tenn. Ct. App. 2001)). Under Tennessee law, the elements necessary to establish a claim for defamation are that "1) a party published a statement; 2) with knowledge that the statement is false and defaming to the other; or 3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999). Although the ultimate issue of whether a statement was understood by the readers in a defamatory sense is a question of fact, the preliminary determination of whether the statement is "[c]apable of being so understood is a question of law to be determined by the court." *Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412, 419 (Tenn. 1978).

We begin by addressing the issue of whether the statement "investigation ended due to resignation" is capable of being understood in a defamatory sense. A court "may determine that a statement is not defamatory as a matter of law only when 'the statement is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense.'" *Grant*, 2015 WL 5772524, at *10 (quoting *Aegis Scis. Corp. v. Zelenik*, No. M2012-00898-COA-R3-CV, 2013 WL 175807, at *6 (Tenn. Ct. App. Jan. 16, 2013)). When determining whether a particular statement is capable of being understood in a defamatory sense, a court must evaluate the statement within the context in which it was made. *Id.* (citing *Revis v. McClean*, 31 S.W.3d 250, 253 (Tenn. Ct. App. 2000)). Moreover, the statement "should be read as a person of ordinary intelligence would understand [it] in light of the surrounding circumstances." *Revis*, 31 S.W.3d at 253.

Mr. Padgett argues that the statement at issue "had the effect of leading a reasonable person to conclude that Plaintiff resigned to avoid criminal prosecution for a crime." He cites case law for the proposition that "'[i]mputation of a crime is defamatory per se.'" *See, e.g., Spicer v. Thompson*, No. M2002-03110-COA-R3-CV, 2004 WL 1531431, at *22 (Tenn. Ct. App. July 7, 2004) (quoting *Draghetti v. Chmielewski*, 626 N.E.2d 862, 866 (Mass. 1994)). We disagree that the statement in the Final Report was capable of being understood as defamatory. A description of the form at issue will

provide some context. The one-page form, entitled "Final Report Regarding Teacher/Administrator with Flagged License," consists of a series of prompts followed by blanks allowing for brief responses. Ms. Johnson provided information in all of the applicable blanks on the form. One of the prompts reads, "Status of investigation"; the form does not, however, specify what type of investigation is being described. In response to subsequent prompts, Ms. Johnson provided information regarding law enforcement (name and contact information) and her contact information.

The State Board had been informed by the previous report (Director's Report) sent by Ms. Johnson on May 14, 2013 that Mr. Padgett was being investigated by the sheriff's department. The Final Report states: "investigation ended due to resignation." Contrary to Mr. Padgett's argument, this statement does not lead a reasonable person to conclude that Mr. Padgett resigned to avoid criminal prosecution. The trial court made the following statements:

> It is undisputed that Plaintiff was investigated by the Clarksville Montgomery County School System following the May 1, 2013 incident. It is further undisputed that Plaintiff submitted his resignation prior to charges of dismissal being presented to the Board of Education. As a result of his resignation, it was not necessary to present those charges to the Board.

> It is undisputed that submitting the Final Report to the Office of Teacher Licensing of the State Board of Education was mandatory and was done within the course and scope of Jeanine Johnson's employment with CMCSS. When the offending statement is "judged within the context it is made" it is incapable of being understood as defamatory.

We agree with the trial court's reasoning and affirm the trial court's grant of summary judgment in favor of Ms. Johnson on the libel claim.

III. Breach of contract

Mr. Padgett's final argument is that the trial court erred in granting summary judgment in favor of CMCSS on his breach of contract claim.

Mr. Padgett alleges that the "CMCSS representatives agreed that the letter containing the charges would not be placed in Plaintiff's personnel file and would not be provided to the State Board if he resigned." According to Mr. Padgett, his attorney was told that, if he resigned, "everything local would stop." He asserts that CMCSS "orally agreed to not take action beyond the required reporting to the State Board."

There is no written agreement. An oral contract may be enforceable if the party seeking to enforce it demonstrates: "'(1) that the parties mutually assented to the terms

of the contract and (2) that these terms are sufficiently definite to be enforceable.'" *Bridgeforth v. Jones*, No. M2013-01500-COA-R3-CV, 2015 WL 336376, at \*10 (Tenn. Ct. App. Jan. 26, 2015) (quoting *Burton v. Warren Farmers Co-op.*, 129 S.W.3d 513, 521 (Tenn. Ct. App. 2002)). Tennessee courts "will not enforce obligations arising out of a contract or transaction that is illegal." *Ledbetter v. Townsend*, 15 S.W.3d 462, 464 (Tenn. Ct. App. 1999). Viewing the evidence in the light most favorable to Mr. Padgett, we conclude that the parties had an express, oral agreement.

Under the applicable Tennessee State Board regulations, Ms. Johnson was under a duty to report Mr. Padgett's resignation to the Office of Teacher Licensing. *See* TENN. COMP. R. & REGS. 0520-02-04-.01(9)(e) (quoted in footnote 5 above). The unrebutted affidavit of Philip Cramer, attorney for the State Board, states that licensure issues that must be reported include "leaving a class unattended, inappropriate relationships with students or cursing at a student." Thus, Ms. Johnson had a mandatory duty to report Mr. Padgett's resignation to the Office of Teacher Licensing.

Mr. Padgett's position is that Ms. Johnson's statement on the Final Report that the investigation had been terminated due to his resignation was a violation of the oral agreement because it was false and misleading and "trigger[ed] a hearing by the State designed to end his teaching career."[6] Mr. Padgett asserts that the sheriff's investigation ended around May 22, 2013, and that he was told that the CMCSS investigation ended prior to May 28, 2013, when the decision was made to present charges to the school board. Thus, he argues, the statement in the Final Report was false. By virtue of the Director's Report sent to the State Board on May 14, 2013, the Board had already been informed of the sheriff's department investigation. Moreover, we find Mr. Padgett's characterization of the CMCSS investigation to be unpersuasive because, as the defendants point out, if Mr. Padgett had not resigned and CMCSS had proceeded with its presentation of charges to the school board, the investigation would have continued. Thus, even if we assume the existence of an oral contract between CMCSS and Mr. Padgett, the information Ms. Johnson provided on the Final Report did not violate the contract.

We find no error in the trial court's grant of summary judgment in favor of CMCSS on the breach of contract claim.

---

[6] We decline to address the breach of contract allegations arising out of the first amended complaint, which the trial court declined to give the plaintiff leave to file.

CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the appellant, Scott A. Padgett, and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE