IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 19, 2022 Session

# IN RE KAILYN B.

**Appeal from the Chancery Court for Campbell County**
**No. 2016-CV-171    Elizabeth C. Asbury, Chancellor**

_____

**No. E2021-00809-COA-R3-PT**
_____

Mother appeals the termination of her parental rights. In addition to disputing the grounds for termination and best interest, Mother argues that the petition was fatally flawed, and Petitioners should not have been allowed to amend after the close of their proof. We conclude that the trial court did not err in deciding the case on its merits because the amendments were not prejudicial to Mother and remedied the petition's deficiencies. We further conclude that clear and convincing evidence was presented of both the grounds for termination and that termination was in the child's best interest. As such, we affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

J. STEVEN STAFFORD, P, J., W.S., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J. and THOMAS R. FRIERSON, II, J., joined.

Kevin W. Shepherd, Maryville, Tennessee, for the appellant, Brittany M. R.

Kristie N. Anderson, Jacksboro, Tennessee, for the appellee, Dustin L. B., and Ali F. B.

## OPINION

### I. FACTS AND PROCEDURAL HISTORY

Respondent/Appellant Brittany M. R.[1] ("Mother") and Petitioner/Appellee Dustin L. B. (Father) are unmarried parents of minor child Kailyn B., born in October 2008. When

_____

[1] In cases involving termination of parental rights, it is this Court's policy to remove the full names. of children and other parties to protect their identities.

Mother and Father ended their relationship, the child remained in the primary custody of Mother. Father was granted co-parenting time and paid court-ordered child support.

Both Mother and Father admit being addicted to drugs, such as cocaine, early in their relationship. In or around June 2010, Father participated in rehabilitation therapy and ceased his drug use. By her own admission, Mother continued with her drug use and began abusing heroin and other opioids, including Hydrocodone and Roxicodone.[2]

During this time where her drug use was escalating, Mother retained custody of the child. In late 2014, Gypsy F. ("Grandmother"), Mother's grandmother, i.e., the child's maternal great-grandmother, became aware that the child was missing significant amounts of kindergarten. This truancy, coupled with Mother's escalating drug use, led Grandmother to contact Father about seeking custody of the child.

On November 24, 2014, Father filed an emergency custody petition in Knox County Juvenile Court ("the juvenile court") alleging the child to be dependent and neglected while in the care of Mother. After a January 14, 2015 hearing, the juvenile court entered an interim order placing the child in Father's custody. The order reflected that Mother had been served with the petition but had not responded or appeared. Mother was incarcerated in Blount County for approximately three months, beginning in February 2015.

A second hearing regarding the emergency custody petition was held on April 30, 2015. Both Father and Mother appeared with counsel. Pursuant to an oral stipulation by Mother, the juvenile court found that the child was dependent and neglected as a result "of the Mother's current incarceration and as a result of the Mother having issues with substance abuse[.]" In the final order, the child was placed in the legal and physical custody of Father. Father's then-fiancé, now-wife, Petitioner/Appellee Ali F. B. ("Stepmother," and together with Father, "Petitioners") was authorized to consent to any medical decisions regarding the child. Mother was granted co-parenting time, to be

> strictly supervised by [Grandmother] at the home of the supervisor or in an appropriate public place approved by the Father. The dates, times, and length for co-parenting time shall be by agreement between the Father and the supervisor. The Mother shall not be entitled to any overnight co-parenting time with the child. The Mother shall not have anyone else with her during the supervised co-parenting time.

---

[2] *See* **State v. Smith**, No. M2020-00181-CCA-R3-CD, 2021 WL 1382584 (Tenn. Crim. App. Apr. 13, 2021) (expert testimony describing both heroin and hydrocodone as opioids); **State v. Dye**, No. M2018-01191-CCA-R3-CD, 2019 WL 5172275, at *4 (Tenn. Crim. App. Oct. 15, 2019) (expert testimony that "Hydrocodone is an opiate and central nervous system depressant" and "the effects of heroin would be similar to the effects of hydrocodone"); **New Jersey Div. Child Prot. & Permanency v. J.B.**, No. A-4795-14T1, 2017 WL 2979342, at *2 (N.J. Super. App. Div. July 13, 2017) (per curiam) (expert testimony explaining that Roxicodone is the brand name of a synthetic opiate also referred to as "Roxies").

Mother was also given a list of specific tasks to be completed prior to petitioning to modify the visitation agreement. Among other requirements aimed at stabilizing her domestic situation, Mother was to attend parenting classes, obtain an honest alcohol and drug assessment, and exercise regular visitation with the child.

Father filed a petition to establish Mother's child support obligation on March 4, 2015. Mother failed to appear for the August 24, 2015 hearing. The juvenile court's order established that Mother was to pay $253.00 per month beginning September 1, 2015. Father's prior obligation was also terminated. The order was eventually filed in August 2016, but designated *nunc pro tunc* to August 24, 2015.

On or about May 29, 2015, Mother entered a guilty plea to a Class E felony for false reporting, a Class A misdemeanor for theft of property under $500.00, and a Class D felony for theft of property over $1,000.00. Mother testified that she successfully completed a total sentence of three and a half years supervised probation on these charges.[3]

Father and Stepmother filed a petition for adoption and termination of parental rights in the Chancery Court for Campbell County ("the trial court") on October 28, 2016. The petition alleged that Mother's parental rights should be terminated on the grounds of abandonment, noncompliance with a permanency plan or a plan of care, and persistence of conditions.[4] Petitioners' motion to permit notice by publication was granted by order of November 15, 2016. Mother failed to answer or appear and the trial court entered a final decree of adoption on April 27, 2017.

---

[3] Mother's three-month incarceration beginning in February 2015 appears to have been pre-trial detention related to these charges.

[4] Petitioners may also have attempted to raise Tennessee Code Annotated § 36-1-113(g)(14) as grounds for termination. That section calls for termination when:

> A legal parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). In their petition, Petitioners argued that Mother's "parental rights shall be terminated in that [she is] unfit, or, alternatively, that substantial harm to the child will result if [Mother's] parental rights are not terminated." This is not a perfect analog to the statutory ground. The trial court's treatment of this allegation is also confusing. Section 36-1-113(g)(14) is not addressed in the trial court's findings of fact or conclusions of law. That section is, however, cursorily addressed in the trial court's final judgment as being found as a ground for termination by clear and convincing evidence. Neither party has raised the inclusion of section (g)(14) in the final judgment as an issue on appeal or otherwise provided any argument as to its applicability to the case-at-bar, so we will not tax the length of this Opinion with substantial discussion of the arguably alleged ground.

Mother filed a petition to modify visitation in the juvenile court in September 2018, including exhibits in support of her allegation that she had satisfied the juvenile court's June 2015 requirements. Then, on March 18, 2019, Mother filed a motion to unseal the child's adoption file along with a petition to set aside the adoption and termination order. By order of July 19, 2019, the trial court granted the motion to unseal and permitted Mother to file her petition to set aside. Therein, Mother argued that the final decree of adoption was void because the trial court granted the order of publication when Petitioners' motion lacked the statutorily-required affidavit of diligent search or inquiry. Petitioners responded to Mother's motion and Mother answered Petitioners' initial petition for adoption and termination. By order of March 16, 2020, designated *nunc pro tunc* to October 18, 2019, the trial court declared the 2017 final decree of adoption void and ordered a new trial on the termination petition. Visitation with the child was neither ordered nor prohibited, pending the new trial.

The trial regarding the termination of Mother's parental rights was held on three separate dates: July 22, 2020, August 25, 2020, and April 14, 2021. Although each party called witnesses on their behalf, the bulk of the proof consisted of Mother's and Father's testimony. Mother admitted that the juvenile court's pre-modification requirements were not fully met prior to the October 2016 petition for adoption and termination. Most were not completed until she filed her petition to modify in 2018, and some remained unsatisfied even by the time of trial. Mother admitted that she had not been honest about her prior opioid use during her alcohol and drug assessment, had not completed the mental health treatment recommended as part of the assessment, and had not executed any release of the assessment to Father or the others indicated in the juvenile court's order. Mother also testified that the singular parenting class she attended in 2018 was not scheduled through the juvenile court as directed.

Mother denied receiving notice of the child support petition while incarcerated in the Blount County Jail but admitted to knowing that Father's child support obligation had been terminated. Mother further acknowledged that she owed a financial responsibility to support the child. Mother explained that she has had stable housing since 2016 and currently lives with her husband, their child together, and her two stepchildren. Mother testified that she currently has a steady income, noting also that at the time of trial her husband was unemployed but receiving veteran's benefits. It was established that Mother worked intermittently from 2013 through 2015 and in 2017, and that her boyfriend from 2013 to 2016 provided her with roughly $180.00 per day to fund her pain pill habit.

Mother acknowledged that she was in active addiction while the child was in her custody prior to November 2014. Mother testified that her heroin use ended after she was released from jail in 2015 and that she ended her regular Roxicodone use in September 2016, but continued to take pills as necessary to combat withdrawal symptoms until she quit "cold turkey" in October 2016. Mother testified that she is currently prescribed Oxycodone and Gabapentin for lower back pain related to a car accident when she was

seventeen.[5] Mother agreed that she will sometimes drive with her children in the car after taking the medication. Mother further testified that she did not disclose to the prescribing institution that she was previously addicted to pain medication.

Mother testified that she visited with the child under Grandmother's supervision approximately six times between the issuance of the permanent custody order in 2014 and July 2016. Mother also testified that she made numerous attempts to contact Father and the child by phone but was denied access by Father. Mother admitted that there were times the child was visiting with Grandmother during which Mother was abusing drugs and did not see the child. Mother explained that she did not want to take the child away from Father and Stepmother, but only wanted to reestablish their relationship.

Father also testified. Father explained that he has stable income and housing, and had been sober for ten years. Father testified that Mother visited with the child only one additional time between when he obtained custody in January 2015 and the final visit in July 2016. Father further testified that Mother contacted him a few times after the July 2016 visit and was able to speak with the child, but that Mother did not request any further visitation. Father described the growth seen in the child after being placed in his custody, as well as the child's close relationship with Stepmother and Stepmother's parents. Father testified that the child had not asked after Mother or Mother's family since he received custody. Father opined that the child would be negatively affected if a relationship was reestablished with Mother.

At the close of Petitioners' proof on August 25, 2020, counsel for Mother made an oral motion for involuntary dismissal[6] and submitted a memorandum in support. Mother argued that the Petitioners had not (1) proven abandonment within the relevant four-month period prescribed by statute; (2) filed the putative father registry statement; (3) included in the petition certain required statistical information about the child's previous addresses or the notice required by Tennessee Rule of Civil Procedure 9A; or (4) proven noncompliance

---

[5] Oxycodone is an opioid similar to Hydrocodone. *See* **Dye**, 2019 WL 5172275, at \*4 (expert testimony that "[H]ydrocodone is not the same as [O]xycodone, although the drugs have similar effects"); **Russell v. Dana Corp.**, No. M2015-00800-SC-R3-WC, 2016 WL 4136548, at \*8 (Tenn. Workers Comp. Panel Aug. 1, 2016) (per curiam) (finding physician's replacement of a "hydrocodone prescription with the more powerful opioid, oxycodone" to be improper in response to "various instances of misuse"). Gabapentin is a controlled substance prescribed for nerve pain. *See* **State v. Franklin**, No. E2019-01047-CCA-R3-CD, 2020 WL 2570030, at \*2 (Tenn. Crim. App. May 21, 2020) (expert testimony).

[6] We note that while Mother's motion was called a "Motion for Directed Verdict" and referred to as such throughout the record in this case, it would more properly be categorized as a Motion for Involuntary Dismissal under Tennessee Rule of Civil Procedure 41.02. *See* **McAdams v. McAdams**, No. E2019-02150-COA-R3-CV, 2020 WL 4723762, at \*2 (Tenn. Ct. App. Aug. 13, 2020) ("A Rule 50 motion for a directed verdict differs markedly from a Rule 41.02(2) motion for involuntary dismissal. The most obvious difference between the two is that a motion for a directed verdict has no place in a bench trial while a motion for involuntary dismissal has no place in a jury trial.") (citing **Burton v. Warren Farmers Co-op.**, 129 S.W.3d 513, 520 (Tenn. Ct. App. 2002)).

with a permanency plan, as none existed as defined under statute. On September 22, 2020, Petitioners filed a motion for leave to amend their petition to include the notice required by Tennessee Rule of Civil Procedure 9A.

After considering Mother's motion and Petitioners' response and motion to amend, the trial court explained in its September 30, 2020 opinion that there was enough proof to go forward on the abandonment issue, Petitioners had substantially complied with the statistical information statute, and Mother would not be prejudiced by allowing Petitioners to include the Rule 9A notice. The trial court also allowed the late filing of the putative father registry statement but agreed with Mother that there was no permanency plan at issue. Petitioners then filed their second motion for leave to amend, adding to the petition information regarding the child's residency over the previous five years, on April 7, 2021, prior to the presentment of Mother's proof.

On May 3, 2021, the trial court issued its findings of fact and conclusions of law. As to Petitioner's second motion to alter or amend, the trial court did not specifically state that the motion was granted, but rather ruled that there had been "compliance with providing other statutorily required averments in the pleadings." The trial court then concluded that two grounds for termination—abandonment by both willful failure to visit and willful failure to support—had been proven by clear and convincing evidence,[7] and that termination of Mother's parental rights was in the best interest of the child. The final judgment terminating Mother's parental rights was entered July 1, 2021. The judgment reflected the trial court's findings of abandonment by failure to support and failure to visit, as well as termination of Mother's rights being in the best interest of the child. Mother filed her notice of appeal to this Court on July 15, 2021.

## II. ISSUES RAISED

As we perceive it, this appeal involves two procedural issues and two substantive issues:

1. Whether the trial court erred in granting Petitioners' motions to amend after the close of their proof.
2. Whether the trial court erred in not dismissing the petition based on its cumulative deficiencies.
3. Whether the trial court erred in finding grounds for termination by clear and convincing evidence.
4. Whether the trial court erred in finding it to be in the best interest of the child to terminate Mother's parental rights.

## III. ANALYSIS

---

[7] The trial court specifically found that Petitioners failed to prove persistence of conditions.

## A.

We begin with Mother's procedural arguments that the trial court erred by allowing Petitioners to cure the deficiencies in the petition rather than dismissing the petition at the close of Petitioners' proof. Mother argues that the petition was defective in three main respects.[8] Mother first contends that the petition failed to comply with Tennessee Code Annotated section 36-1-113(d)(3)(A)(i)[9] in that the petition was filed before the putative father registry was consulted. Mother further argues that the petition did not contain certain statistical information concerning the residences of the child during the previous five years as required by Tennessee Code Annotated section 36-6-224.[10] Finally, Mother argues that the petition failed to include the notice required by Tennessee Rule of Civil Procedure 9A.[11]

---

[8] Mother initially discusses the deficiency relating to the Petitioners' service by publication that lead to the April 27, 2017 final decree of adoption. However, the trial court agreed with Mother's petition to set aside that order, and voided the final decree based on improper service. Mother also points to Petitioners' reference to a permanency plan as evidence of the petition's deficiency. The trial court acknowledged that a permanency plan as defined in Tennessee Code Annotated section 37-2-402(9) was inapplicable to this case and granted Mother's motion for involuntary dismissal on that ground. As such, section 36-1-113(g)(2) was not a basis for the trial court's termination of Mother's parental rights.

[9] The statute in effect when the petition was filed read in pertinent part:

> (3)(A) The petition, or allegations in the adoption petition, shall contain a verified statement that:
> (i) The putative father registry maintained by the department has been consulted within ten (10) working days of the filing of the petition and shall state whether there exists any claim on the registry to the paternity of the child who is the subject of the termination or adoption petition[.]

Tenn. Code Ann. § 36-1-113 (2016).

[10] The statute provides in pertinent part:

> (a) Subject to the provisions of § 36-4-106(b), in a child-custody proceeding, each party, in its first pleading or in an attached affidavit, shall give information, if reasonably ascertainable, under oath, as to the child's present address or whereabouts, the places where the child has lived during the last five (5) years, and the names and present addresses of the persons with whom the child has lived during that period. . . .

Tenn. Code Ann. § 36-6-224.

[11] Rule 9A reads:

> In addition to meeting all other applicable rules governing the filing of pleadings, any complaint or petition seeking a termination of parental rights shall contain the following notice: "Any appeal of the trial court's final disposition of the complaint or petition for termination of parental rights will be governed by the provisions of Rule 8A, Tennessee Rules of Appellate Procedure, which imposes special time limitations for the filing of a transcript or statement of the evidence, the completion

Mother argues that the culmination of multiple deficiencies in the petition was not simply harmless error and the order allowing adoption and termination should be set aside. In support of her argument, Mother looks to *In re Natalie R.C.*, No. E2011-01185-COA-R3-PT, 2011 WL 4924170 (Tenn. Ct. App. Oct. 18, 2011), a termination case involving a petition with similar deficiencies. There, the parties agreed that the petition to terminate the father's parental rights was missing the required notice of special appellate timing in termination cases, the required statement about consulting the putative father registry, the required statistical information regarding the child's residence, and the required language regarding the effect of termination. *Id.* at *2–4. Mother correctly quotes this Court in its conclusion that: "[h]owever technical these omissions may seem, given the number of omissions considered in the context of a termination of parental rights, they may not be overlooked or excused." *Id.* at *5. Yet Mother omits the very next sentence which reads: "We, however, do not agree with Father that these defects are fatal and require the petition to be dismissed." *Id.* Instead, this Court determined the defects to be "such that they can be corrected . . . if given the opportunity[.]" *Id.* The order terminating the father's rights was therefore vacated and the case was remanded to allow the petitioner the chance to remedy the deficiencies in her petition. *Id.* Thus, the case stands for the exact opposite proposition as Mother would have us believe—in the face of multiple deficiencies, petitions for termination of parental rights may be amended rather than dismissed. And unlike in *In re Natalie R.C.*, the Petitioners here corrected the deficiencies in their petition prior to the final judgment.

Petitioners' first motion for leave to amend involved adding to their petition the notice required by Tennessee Rule of Civil Procedure 9A and was filed September 22, 2020. Because Mother was represented by competent counsel, the trial court found no prejudice to Mother in allowing Petitioners to amend the petition to include the Rule 9A notice. Petitioners' second motion to amend was filed April 7, 2021, and included statistical data about the child's previous addresses as required by Tennessee Code Annotated section 36-6-224. The motion was never expressly granted by the trial court. In its September 30, 2020 opinion, the trial court acknowledged the missing information but found that Petitioners had substantially complied with the statute. Then, when the motion to amend was discussed prior to Mother putting on her proof, the trial court referred the parties to the September opinion, explaining that, "[a]s far as I'm concerned, that's been addressed." Later, in its May 3, 2021 opinion, the trial court acknowledged Petitioners' compliance with "statutorily required averments." Taken together, these statements indicate that the trial court found that Petitioners could amend their petition to include the missing information and that the resulting amended petition was sufficiently compliant with the

---

and transmission of the record on appeal, and the filing of briefs in the appellate court, as well as other special provisions for expediting the appeal. All parties must review Rule 8A, Tenn. R. App. P., for information concerning the special provisions that apply to any appeal of this case."

Tenn. R. Civ. P. 9A.

statutory requirements such that any remaining deficiencies were not fatal. *Cf. **Morgan Keegan & Co. v. Smythe***, 401 S.W.3d 595, 608 (Tenn. 2013) ("[W]hen construing orders and judgments, effect must be given to that which is clearly implied, as well as to that which is expressly stated.").

Both of Petitioners' amendments fall under Tennessee Rule of Civil Procedure 15.01. The admonition that "leave [to amend a pleading] shall be freely given when justice so requires" in Rule 15.01 reflects Tennessee's "history of favoring amendments." ***City of Oak Ridge v. Levitt***, 493 S.W.3d 492, 499 (Tenn. Ct. App. 2015). Indeed, "Tennessee law and policy have always favored permitting litigants to amend their pleadings to enable disputes to be resolved on their merits rather than on legal technicalities." ***Hardcastle v. Harris***, 170 S.W.3d 67, 80 (Tenn. Ct. App. 2004) (collecting cases dating to 1814). So while the decision to permit an amendment is discretionary, the mandatory language of Rule 15.01 "substantially lessens the exercise of pre-trial discretion on the part of a trial judge." ***Blackwell v. Sky High Sports Nashville Operations, LLC***, 523 S.W.3d 624, 656 (Tenn. Ct. App. 2017) (quoting ***Branch v. Warren***, 527 S.W.2d 89, 91 (Tenn. 1975)).

In addressing motions to amend, trial courts have been directed to "consider several factors, including 'undue delay in filing the amendment, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and the futility of the amendment.'" ***Id.*** (quoting ***Gardiner v. Word***, 731 S.W.2d 889, 891–92 (Tenn. 1987)). Of these, the potential prejudicial effect of the proposed amendment is the most important to the trial court's analysis. ***Hardcastle***, 170 S.W.3d at 81 (citing 6 Charles A. Wright et al., *Federal Practice and Procedure* § 1487 (3d ed. 2022) (addressing consideration of motions to amend under the identical rule of federal civil procedure)). Mother argues that both motions should have been denied based on undue delay, repeated failure to cure deficiencies, and undue prejudice.

Delay alone is insufficient to justify denying a motion to amend. ***March v. Levine***, 115 S.W.3d 892, 909 (Tenn. Ct. App. 2003) (citing ***Moore v. City of Paducah***, 790 F.2d 557, 562 (6th Cir. 1986)). Yet, unexplained delay coupled with other factors, like prior knowledge of facts underlying a newly-added cause of action or undue prejudice to the other party, could constitute such undue delay as to proscribe amendment. ***Id.*** (citations omitted). Thus, even in its contemplation of other factors, a trial court must consider an amendment's prejudicial effect. A trial court's analysis of the prejudicial effect of a proposed amendment is a fact-intensive exercise. ***Hardcastle***, 170 S.W.3d at 81. The court must consider how its decision whether to grant the request to amend would affect the parties, requiring an inquiry into "(1) the hardship on the moving party if the amendment is denied; (2) the reasons for the moving party's failure to include the claim, defense, or other matter in its earlier pleading; and (3) the injustice to the opposing party should the motion to amend be granted." ***Id.*** (citing Wright, et al., *supra*, at § 1487).

A trial court's decision on a motion to amend is reviewed under an abuse of discretion standard. ***Blackwell***, 523 S.W.3d at 656 (citing ***Fann v. City of Fairview***, 905 S.W.2d 167, 175 (Tenn. Ct. App. 1994)). Therefore, we "presume that the trial court's discretionary decision is correct, and we consider the evidence in the light most favorable to the decision." ***Wright ex rel. Wright v. Wright***, 337 S.W.3d 166, 176 (Tenn. 2011) (citations omitted). Here, the evidence supports allowing Petitioners to amend.

Some of the relevant factors certainly weigh against allowing the amendment in this case. For one, Petitioners, to this day, have never offered any explanation for the delay in filing a correct petition. And they needed two amendments to achieve a substantially correct petition. On the other hand, however, there is no allegation that Petitioners were acting in bad faith. Moreover, Petitioners did file both their amendments shortly after Mother's motion for involuntary dismissal brought this matter to their attention. This is far earlier than the petitioner in ***In Re Natalie***, who was given an opportunity to correct deficiencies in her petition for the first time after an appeal. 2011 WL 4924170, at *5. And the hardship faced by Petitioners if the amendment was not granted is harsh; their petition, which alleges that the parent of a child abandoned that child and has no relationship with her, would be denied on a technicality.

What is more, the trial court found that these technical deficiencies had no effect on Mother. In other words, Mother suffered no prejudice due to the technical deficiencies. The trial court's finding is in line with the holdings of other cases that amending a termination petition to include the Rule 9A notice is not prejudicial to responding parties and that failure to include the notice is harmless error. ***In re Bentley D.***, No. E2016-02299-COA-R3-PT, 2018 WL 1410903, at *4 (Tenn. Ct. App. Mar. 21, 2018) (finding no prejudice where neither original petition or amendment contained Rule 9A notice); ***In re J.G.H., Jr.***, No. W2008-01913-COA-R3-PR, 2009 WL 2502003, at *12 (Tenn. Ct. App. Aug. 17, 2009) (holding that "the trial court did not err in denying Mother's oral motion to dismiss or in allowing the [petitioners] to file an amendment to their petition to include the required notice"); ***In re S.R.M.***, No. E2008-01359-COA-R3-PT, 2009 WL 837715, at *15 (Tenn. Ct. App. Mar. 27, 2009) ("Father was not prejudiced by any initial noncompliance with Tenn. R. Civ. P. 9A. Any error was harmless and does not require reversal. The Juvenile Court did not err in allowing DCS to amend the petition." (citation omitted)). Under these circumstances, the trial court's decision to allow Petitioners the opportunity to correct the deficiencies in their petition was a reasonable "choice among several acceptable alternatives." ***Lee Med., Inc. v. Beecher***, 312 S.W.3d 515, 524 (Tenn. 2010). As such, the trial court did not abuse its discretion in allowing these amendments. Given the amendments, Mother's arguments that the petition lacked either the required Rule 9A notice or necessary statistical information such that it should have been dismissed are without merit.

The only remaining deficiency raised by Mother is the failure to include the statement regarding the putative father registry. In its response to Mother's motion to

- 10 -

dismiss, the trial court allowed Petitioners to late file the statement.[12] Petitioners allege that the statement was filed before the completion of trial. The trial court acknowledged that the statement was in the court file in its findings of fact and conclusions of law. The statement does not, however, appear in the record designated upon appeal. "In the absence of a transcript or statement of the evidence, we conclusively presume that the findings of fact made by the trial court are supported by the evidence and are correct." *In re M.L.D.*, 182 S.W.3d 890, 895 (Tenn. Ct. App. 2005) (citing *J.C. Bradford & Co. v. Martin Constr. Co.*, 576 S.W.2d 586, 587 (Tenn. 1979)). Here, without the benefit of a full appellate record, we are unable to adequately review the trial court's finding that the statement was filed. Thus, we cannot dispute that the petition's deficiencies were fully remedied prior to the issuance of the trial court's final judgment. Because Petitioners were properly given a chance to correct their petition and have done so, the trial court did not err in not dismissing the petition but resolving the case on its merits.

**B.**

We move next to the substantive issues, namely the trial court's findings that clear and convincing evidence supported termination of Mother's parental rights. Parental rights are "among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016) (collecting cases). In Tennessee, termination of parental rights is governed by statute, which identifies "situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). "[P]arents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." *In re Carrington H.*, 483 S.W.3d at 511. These procedures include "a heightened standard of proof—clear and convincing evidence." *Id.* at 522 (citation omitted); *accord In re Addalyne S.*, 556 S.W.3d 774, 782 (Tenn. Ct. App. 2018) ("Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases.").

Thus, a party seeking to terminate a parent's rights must prove by clear and convincing evidence (1) the existence of at least one of the statutory grounds in section 36-1-113(g), and (2) that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The clear and convincing evidence standard applicable here is "more exacting than the 'preponderance of the evidence' standard, although it does not

---

[12] The admissibility of evidence rests squarely within the sound discretion of the trial court and will not be disturbed absent clear abuse. *Young v. Young*, 971 S.W.2d 386, 392 (Tenn. Ct. App. 1997) (collecting cases).

- 11 -

demand the certainty required by the 'beyond a reasonable doubt' standard. ***In re S.R.C.***, 156 S.W.3d 26, 29 (Tenn. Ct. App. 2004) (citation omitted). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." ***In re Carrington H.***, 483 S.W.3d at 522. The standard "ensures that the facts are established as highly probable, rather than as simply more probable than not." ***Id.*** (citing ***In re Audrey S.***, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); ***In re M.A.R.***, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005)).

In termination cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *See* Tenn. R. App. P. 13(d); ***In re Carrington H.***, 483 S.W.3d at 523–24. "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." ***In re Carrington H.***, 483 S.W.3d at 524 (citation omitted).

### 1. Grounds for Termination

Mother does not expressly raise the issue that the trial court erred in finding clear and convincing evidence of grounds for termination. Instead, she mentions the trial court's finding of abandonment within her discussion of the petition's procedural deficiencies. We will nevertheless address each of the grounds for termination discussed by the trial court. *See id.* at 525–26 (holding that "in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal"). The grounds at issue in this appeal are therefore: (1) abandonment based on willful failure to visit and (2) abandonment based on willful failure to support.[13]

Tennessee Code Annotated section 36-1-113(g)(1) provides abandonment by a parent as a ground for the termination of parental rights. In turn, Tennessee Code Annotated section 36-1-102 defines the term "abandonment." At the time the termination petition was filed, in October 2016, abandonment was defined, in pertinent part, as follows:

> For purposes of terminating the parental or guardian rights of a parent or

---

[13] We again note that Petitioners may have attempted to raise a failure to manifest the ability or willingness to assume custody or responsibility for the child as a ground for termination in their petition. However, the ground was not argued at trial or addressed in the parties' briefs. Thus, even if the ground had been raised, it has since been abandoned. Furthermore, no additional findings of fact or conclusions of law regarding this ground appear in the record. *See* Tenn. Code Ann. § 36-1-113(k) (requiring specific findings of fact and conclusions of law in termination orders). We therefore decline to review this ground further, as although ***In re Carrington H.*** directs us to address each ground found by the trial court, we do not interpret that directive as requiring such a fruitless endeavor.

parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent . . . of the child who is the subject of the petition for termination of parental rights or adoption, that the parent . . . either [has] willfully failed to visit or [has] willfully failed to support or [has] willfully failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A) (2016). That section further provided that a willful failure to visit consists of "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation[.]" *Id.* § 36-1-102(1)(E). "Token visitation" was defined as visitation that "constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[.]" *Id.* § 36-1-102(1)(C). In this case, the four-month period at issue spans from June 28, 2016, to October 27, 2016.

Mother first finds fault with the trial court's finding of a willful a failure to visit because she had visited with the child within the four-month period prescribed by statute. Our analysis of this issue is somewhat complicated because the proof at trial as to visitation was not strictly limited to the four-month period at issue. Both parties agree that at least one visit did take place during this period, in July 2016. Father's testimony is that there may have been one additional visit during the four-month period, as he said that another visit occurred in either May or June 2016.[14] Regardless, Father testified that both visits were improper based on Mother's failure to comply with the juvenile court's restrictions. Grandmother acknowledged that there were two incidents involving Mother's visitation with the child not following the juvenile court's order, although she was unable to say exactly when Mother visited. So then, at best, Father testified that Mother participated in a maximum of two visits during the four-month period, with both marred by misconduct.

In contrast, Mother testified that she had actually visited with the child six or seven times after Father received custody, with the final visit being in July 2016. Mother's testimony was unclear as to when the other visits occurred and she provided no proof other than her testimony to support the number of visits. Faced with this dispute, the trial court chose to credit the testimony of Father and Grandmother over that of Mother. The trial court is the "arbiter of witness credibility of those who testify live before it." *In re Hope G.*, No. E2021-01521-COA-R3-PT, 2022 WL 4391897, *6 (Tenn. Ct. App. Sept. 23, 2022). A trial court's determination of issues that hinge on witness credibility should be afforded "considerable deference." *Id.* (quoting *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn.

---

[14] Father further testified that these were the only two visits that Mother had with the child in the approximately five-year period from his January 2015 receipt of custody until trial in 2020.

2014)). "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." ***Wells v. Tennessee Bd. of Regents***, 9 S.W.3d 779, 783 (Tenn. 1999).

Here, Mother has not presented clear and convincing evidence to overturn the trial court's credibility findings on this issue. For one, Mother's testimony was entirely unclear as to when any of these alleged visits took place. Moreover, Mother conceded that she has previously been dishonest about her efforts to comply with the juvenile court's order in order to regain custody. Finally, it appears that there is no dispute that Mother failed to engage in any visitation after July 2016. Thus, at the very least, Mother failed to engage in any visitation for approximately three out of the four months that make up the relevant four-month period. Given the other proof in the record, including the testimony of Father and Grandmother, the trial court did not abuse its discretion in discrediting Mother's unsubstantiated testimony. Thus, the trial court's finding that Mother participated in one or possibly two visits during the four-month period is affirmed.

The record further supports the trial court's finding that Mother's efforts were token during this time frame. According to the proof presented, at some point in July 2016, Mother, Grandmother, various other family members, and the child went to lunch and a movie. There is no indication that Mother and the child were able to cultivate a meaningful relationship in the roughly two-hour visit while watching a movie with other family members present. Other than the failure to follow the juvenile court's supervision requirements there is no indication in the record that the previous visit was any more significant. Thus, even if we view the evidence in the light most favorable to Mother and say the earlier visit was within the relevant period, the dearth of earlier visits coupled with a purely perfunctory July 2016 visit supports the trial court's finding that the visitation within the relevant four-month period was merely "token" within the meaning of Tennessee Code Annotated section 36-1-102(1)(C) (2016). *See, e.g.*, ***In re Matthew T.***, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *12 (Tenn. Ct. App. Apr. 20, 2016) (four visits in a four-month period constituted token visitation); ***In re E.L.R.***, No. E2014-00394-COA-R3-PT, 2014 WL 6735394, at *7 (Tenn. Ct. App. Dec. 1, 2014), *perm. app. denied* (Tenn. Feb. 25, 2015) (seeing the child five times in the four month period was token visitation); ***In re Joseph G.***, No. E2012-2501-COA-R3-PT, 2013 WL 3964167, at *9 (Tenn. Ct. App. July 31, 2013) (weekly visits for only two of the four months constituted token visitation); ***In re Hope A. A.***, No. E2012-01209-COA-R3-PT, 2013 WL 1933026, at *11 (Tenn. Ct. App. May 10, 2013) (five visits for a total of ten hours was insufficient); ***In re Keri C.,*** 384 S.W.3d at 750 (four or five visits was token visitation).

Mother argues, however, that any failure to visit after July 2016 was the result of Father's interference and thus not willful as required by statute.[15] Mother argued at trial

---

[15] The current version of this statute does not include willfulness in the definition of abandonment. Tenn. Code Ann. § 36-1-102(1)(A) (2022). Instead, it provides an affirmative defense to a charge of

- 14 -

that she made numerous attempts to speak with the child and was prevented from doing so by Father. Father denied preventing Mother from speaking to the child when she called, and further argued that neither Mother nor Grandmother requested any visitation after the July 2016 visit. Citing her failure to seek visitation from 2016 until 2018, the trial court found that Mother's failure to engage in more than token visitation was willful.

"A parent's failure to visit a child is considered willful when the parent is aware of his or her duty to visit, has the capacity to visit, makes no attempt to visit, and has no justifiable excuse for his or her failure to visit." *In re Hope G.*, 2022 WL 4391897, at \*8 (citing *In re Audrey S.*, 182 S.W.3d at 864). Willful conduct is "the product of free will rather than coercion." *In re Audrey S.*, 182 S.W.3d at 863. Therefore, a parent's "[f]ailure to visit . . . is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child." *Id.* at 864 (citations omitted).

Mother testified that she attempted to call and speak with the child on numerous occasions but was rebuffed by Father each time. Mother also testified she purchased a cell phone for the child, which Father discarded. In contrast, Father testified that Mother had called only one or two times after the July 2016 visit and was able to speak with the child each instance. Father testified that no further requests for visitation were made by either Mother or Grandmother during any of these calls. Father did not, however, deny that he discarded the phone purchased for the child.

Under these circumstances, we must affirm the trial court's finding as to willfulness. Faced with Father's testimony that Mother never attempted to set up visitation after July 2016, Mother once again offered no proof beyond her unsupported testimony. Importantly, Grandmother did not claim to have attempted to facilitate visitation between Mother and the child only to rebuffed by Father. Given our earlier discussion of Mother's credibility on this issue, the trial court was therefore well within its discretion to credit Father's testimony that Mother did not attempt to visit after July 2016. *In re Hope G.*, 2022 WL 4391897, \*6.

Father's decision to discard the child's cell phone, while relevant, does not alter our conclusion. For one, the juvenile court's order makes clear that all visitation scheduling was to go through Father. It does not appear unreasonable for him to rely on the prior order and insist that communication go through him. Moreover, Father's decision to not allow the cell phone does not amount to a significant restraint on Mother's ability to visit. In fact,

---

abandonment that the failure to visit or support was not willful. *Id.* § 36-1-102(1)(I) (2022). The statute in effect at the time the petition was filed included willfulness in its definition of abandonment. Thus, Petitioners needed to prove Mother's abandonment was willful by clear and convincing evidence to meet their burden of proof. *Id.* § 36-1-102(1)(A) (2016).

- 15 -

Mother admitted that she sometimes chose to do illegal drugs rather than visit with her child and that she continued to use illegal drugs regularly well into the four-month period. Under these circumstances, the evidence does not preponderate against the trial court's finding that Mother willfully failed to engage in more than token visitation with her child in the relevant four-month period. Accordingly, we affirm the trial court's termination of Mother's rights on the ground of abandonment by willful failure to visit.

The second ground for termination of Mother's parental rights involved abandonment by willful failure to support. At the time the petition was filed, willful failure to support involved a "willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child" Tenn. Code Ann. § 36-1-102(1)(D) (2016). There is no dispute that Mother has not made any payments toward child support to date. The question, therefore, is whether Mother's failure to support the child was willful. "A parent's failure to support is 'willful' when the parent (1) knows of his or her duty to support, (2) has the ability to provide support, (3) makes no effort to provide support, and (4) has no justifiable reason for not providing support." *In re Jeremiah N.*, No. E2016-00371-COA-R3-PT, 2017 WL 1655612 (Tenn. Ct. App. May 2, 2017) (citing *In re Audrey S.*, 182 S.W.3d at 864).

As to the first, third, and fourth elements of willfulness, Mother blames her nonpayment of the court-ordered child support on a lack of notice based on her incarceration. Mother was incarcerated in Blount County for approximately three months beginning in February 2015. The child support hearing took place August 24, 2015. The order entered August 12, 2016 reflected that Mother was not in attendance but that a copy was sent to two of her last known addresses. Mother also admitted that she knew that Father's child support obligation was terminated, which took place at the same hearing initiating Mother's obligation. Mother further testified that she knew the child needed financial support. Regardless of Mother's actual notice of her court-ordered child support obligation, parents are "presumed to have knowledge of a parent's legal obligation to support such parent's child." Tenn. Code Ann. § 36-1-102(1)(H) (2016). Mother's argument in this regard is, respectfully, without merit.

As to the second willfulness element, Mother claims that there was no proof presented that she was actually able to provide financial support. Petitioners argue that Mother chose to spend the money she had access to during the relevant period on illegal drugs, rather than on supporting the child. We agree with Petitioners.

This Court has determined that evidence showing the parent worked only intermittently during the relevant period is insufficient on its own to establish the parent's ability to pay support. *In re Addalyne S.*, 556 S.W.3d at 789 (citing *In re T.W.*, No. E2017-00317-COA-R3-PT, 2018 WL 1831109, at *8 (Tenn. Ct. App. Apr. 17, 2018)). Generally, an ability to pay requires proof of both income and expenses. *Id.* (collecting cases).

Similarly, the purchase of illegal drugs alone is insufficient to prove that Mother's failure to provide support was willful. *Id.* at 788 (citing *In re Kira G.*, No. 2016-01198-COA-R3-PT, 2017 WL 1395521, at *6 (Tenn. Ct. App. April 18, 2017) ("Although illegal drug abuse and the purchase or sale of illegal drugs may well be relevant to determining whether a parent willfully has failed to support his or her child while supporting his or her drug use, illegal drug activity by itself does not establish willfulness.")).

However, *In re Addalyne S.* is factually distinguishable from the present case. There, the mother was gainfully employed during the relevant period, although no evidence in the record described the mother's hourly pay or weekly hours worked. *Id.* Instead, the evidence showed that the mother was able to buy general necessities as well as illegal drugs. *Id.* This Court determined that illegal drug use was not enough on its own to establish willful failure to support when the mother was also making gifts to the child. *Id.* at 789.

The proof in this case, however, is different: Mother had consistent access to significant amounts of money and none of it was put toward supporting the child. Specifically, Mother's testimony established that she was receiving considerable amounts of money before and during the relevant four-month period and spent that money on illegal drugs rather than provide any financial support to the child. Mother testified that her boyfriend from 2013 through late 2016[16] provided her with roughly $180.00 per day to fund her pain pill addiction, as well as additional money for "[a]nything [she] wanted." This period of time clearly encompasses the relevant four-month period. Mother testified that there was nothing prohibiting her from employment during the relevant four-month period, but that it was a choice not to work. Furthermore, it was established that Mother was living with and supported by either family or boyfriends during the relevant period.

Together, the information in the record establishes that Mother chose to spend significant amounts of money on daily drug use yet provided no financial support to the child at all. Under these circumstances, we believe that the evidence was sufficient to eliminate any serious or substantial doubt as to Mother's capacity to support the child during the relevant time. Coupled with Mother's knowledge of her obligation to support the child and her continued failure to provide even token support, we conclude that there was clear and convincing evidence that Mother's failure to support the child was willful. Thus, the trial court's termination of Mother's rights on the ground of abandonment by failure to support is affirmed.

### 2. Best Interest

Because we have determined that at least one statutory ground has been proven for terminating Mother's parental rights, we must now decide if Petitioners have proven, by

---

[16] We emphasize that this is not Mother's now-husband.

clear and convincing evidence, that termination of Mother's rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). The factors that courts should consider in ascertaining the best interest of children include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

T.C.A. § 36-1-113(i) (2016).[17] "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d at

---

[17] The current version of this statute includes eleven additional factors to be considered. Tenn. Code Ann. § 36-1-113(i)(1) (2022). Neither party asserts that the revised version of the statute is applicable in this case, so we will refer to the factors in place at the time the petition was filed. We use the 2016 version of section 36-1-113(i) throughout this Opinion.

667 (citations omitted). Likewise, determining a child's best interest does not entail simply conducting "a rote examination" of each factor and then totaling the number of factors that weigh for or against termination. *In re Audrey S.*, 182 S.W.3d at 878. Instead, the "relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing *White*, 171 S.W.3d at 194).

The factual findings made in connection with the best interest analysis "must be proven by a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn., 2015) (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.* (citations omitted). In this case, no delicate balancing of the factors is required. Virtually all of the statutory factors militate, more or less heavily, in favor of terminating Mother's parental rights, one of the factors is inapplicable, and only one of the factors weighs against termination.

Factors (3), (4), (5), and (9) weigh most heavily in favor of terminating Mother's rights. It is likely true that Mother had a meaningful relationship with the child prior to Father obtaining custody, when the child was approximately seven. However, the child is now approximately fourteen years old. It has been more than six years since Mother's last visit with the child in July 2016. The child has not seen Mother for roughly half of her life. *See* Tenn. Code Ann. § 36-1-113(i)(3). The testimony at trial was that the child calls Stepmother "Mom" and has not asked about Mother or Mother's family since going to live with Father and Stepmother. At this point, no meaningful relationship remains between Mother and the child. *See id.* § 36-1-113(i)(4). It is therefore highly likely that reintroducing the child to Mother now would have serious negative effects on the child's emotional or psychological condition. *See id.* § 36-1-113(i)(5); see also *In re Jaydin A.*, No. M2018-02145-COA-R3-PT, 2019 WL 6770494, at *8 (Tenn. Ct. App. Dec. 12, 2019) ("Although no proof was specifically presented that a change in caretakers would be harmful to the child, common sense dictates that removing a child from the only family she has ever known and placing her with a stranger who has historically chosen to put his own desires ahead of the child's needs would cause harm to the child."). And regardless of her knowledge of her court-ordered obligation to do so, Mother has yet to provide any financial support toward the care or wellbeing of the child despite her admitted knowledge that the child needs to be supported. *See* Tenn. Code Ann. § 36-1-113(i)(9).

Factors (1), (6), and (7), while requiring a closer consideration, also weigh in favor of terminating Mother's parental rights. The trial court acknowledged that Mother has taken significant steps to improve her situation and the evidence supports these findings. Mother has stable housing and gainful employment. Mother has another child and is a stepparent to her husband's two children. *See id.* § 36-1-113(i)(1). There has been no

further criminal activity or incidents of domestic violence, and Mother has ceased use of illegal drugs. *See id.* § 36-1-113(i)(6), (7). However, Mother now has a prescription for pain pills similar to those to which she was previously addicted. While her current use of controlled substances may be legal, considering Mother's pattern of prevarication regarding her drug use—both during her court-ordered drug and alcohol assessment and to the prescribing pain clinic—this Court has serious misgivings about Mother's continued use of opioids. *See id.* § 36-1-113(i)(7); *In re Navada N.*, 498 S.W.3d 579, 595 (Tenn. Ct. App. 2016) ("[A] suitable home requires more than a proper physical living location. It requires that the home be free of drugs and domestic violence." (internal quotation omitted)). We further note that the child was removed from Mother's custody due to issues of neglect caused by Mother's drug use. *See* Tenn. Code Ann. § 36-1-113(i)(6). Moreover, even Mother's attempt to regain visitation came years after the cessation of visitation when Mother still had not accomplished the requirements set forth by the juvenile court. In particular, neither the alcohol and drug assessment nor the parenting classes were completed properly. We have held in similar circumstances that such effort is simply "too little, too late." *See In re Emily N.I.*, No. E2011-01439-COA-R3-PT, 2012 WL 1940810, at *16 (Tenn. Ct. App. May 30, 2012) (explaining that the parents' "refusal to complete a number of the requirements until after the termination petition was filed . . . was simply '[t]oo little, too late'" given the length of time the child had been removed from the parents' custody); *In re A.W.*, 114 S.W.3d 541, 546 (Tenn. Ct. App. 2003) (holding that the mother's improvement only a few months prior to trial was "[t]oo little, too late").

Factor (2), regarding lasting adjustment after reasonable efforts by social services, was found by the trial court to be inapplicable to the case at hand. The evidence supports this finding as rehabilitative efforts by social services were not at issue. *See* Tenn. Code Ann. § 36-1-113(i)(2). Therefore, this factor does not carry any weight here.

The trial court also found factor (8), regarding the parent's mental and/or emotional status, to be inapplicable. However, no proof was presented that Mother's mental or emotional status would be detrimental to the child or prevent Mother from effectively providing safe and stable care and supervision. *See id.* § 36-1-113(i)(8). Thus, factor (8) would actually weigh against terminating Mother's rights. *See, e.g.*, *In re Jayda J.*, No. M2020-01309-COA-R3-PT, 2021 WL 3076770, at *28 (Tenn. Ct. App. July 21, 2021) (holding that because no evidence was presented as to a factor, the factor weighed against termination); *In re Taylor B.W.*, 397 S.W.3d 105, 113 (Tenn. 2013) (affirming the holding that the absence of proof as to a factor meant the factor did not favor termination).

Thus, while not all the factors in this case favor termination equally, more factors weigh in favor of termination than weigh against it. But we do not determine the best interest of a child merely by totaling the number of factors that weigh for or against termination; instead, that determination often depends on the relevancy and weight of each factor. *See In re I.E.A.*, 511 S.W.3d 507, 518 (Tenn. Ct. App. 2016) (quoting *In re Audrey S.*, 182 S.W.3d at 878). Mother has not visited with the child since July 2016 or provided

financial support since the child was placed in Father's custody in 2015. Moreover, the child has developed a close relationship with Stepmother over the last several years and no longer has a meaningful relationship with Mother, such that she would be negatively affected by reestablishing contact with Mother. Here, from the child's perspective, we must conclude that the most important factors are the lack of meaningful relationship between the child and Mother and the detrimental effect that a change in caretakers would cause. *See* **In re Addalyne S.**, 556 S.W.3d at 795–96 ("This Court has previously indicated that in some cases the lack of a meaningful relationship between a parent and child is the most important factor[.]"). With all of the above considerations in mind, we conclude that there was clear and convincing evidence to establish that termination of Mother's parental rights was in the best interest of the child. Accordingly, we affirm the trial court's ultimate decision to terminate Mother's parental rights.

## IV. CONCLUSION

Based on the foregoing, the judgment of the Chancery Court for Campbell County is affirmed and this cause is remanded for further proceedings as are necessary and consistent with this Opinion. Costs are taxed to Appellant, Brittany M. R., for which execution may issue, if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE